**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| GEN5, INC., CHRIS FRANZOY and TAMMY FRANZOY, Plaintiffs, | § | |
| vs. | § | Cause No. 3:23-cv-00172-DB |
| AYOUB INVESTMENTS-TEXAS, INC., IN ROUTE TRADING COMPANY, INC., FIVE STAR 6021, LLC, FIVE STAR 6305, LLC, and JERRY C. AYOUB. Defendant. | § | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiffs file this their First Amended Complaint against Defendants Ayoub Investments-Texas, Inc., In Route Trading Company, Inc., Five Star 6021, LLC, Five Star 6305, LLC, and Jerry C. Ayoub and would respectfully show as follows:

**PARTIES**

1. Plaintiff, Gen5, Inc. f/k/a Young Guns, Inc., is a New Mexico corporation, with its principal place of business located in New Mexico.
2. Plaintiff, Chris Franzoy, is an individual residing in Hatch, New Mexico.
3. Plaintiff, Tammy Franzoy, is an individual residing in Hatch, New Mexico.
4. Defendant, Ayoub Investments-Texas, Inc., is a corporation registered in Texas. Ayoub Investments-Texas, Inc. may be served with process through its registered agent, Edna A. Lopez, at 12190 Rojas Drive, El Paso, Texas 79936. Defendant has already answered and appeared in this matter.
5. Defendant, In Route Trading Company, Inc., is a Nevada corporation. In Route Trading Company, Inc. may be served with process through its registered agent American

Corporate Enterprises, Inc. at 123 West Nye Lane, Suite 129, Carson City, Nevada 89706. Defendant has already answered and appeared in this matter.

6. Defendant, Five Star 6021, LLC is an Arizona corporation. Five Star 6021, LLC may be served with process through its statutory agent Edna A. Lopez at 6720 N. Scottsdale Road, #130, Scottsdale, Arizona 85253.

7. Defendant, Five Star 6305, LLC is an Arizona corporation. Five Star 6021, LLC may be served with process through its statutory agent Edna A. Lopez at 6720 N. Scottsdale Road, #130, Scottsdale, Arizona 85253.

8. Defendant, Jerry C. Ayoub, is an individual residing in Maricopa County, Arizona who may be served with process at 11421 E Arabian Park Drive, Scottsdale, Arizona 85259.

## JURISDICTION AND VENUE

9. This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) in that it is an action between corporations of different states and the amount in controversy exceeds $75,000.00.

10. This court has personal jurisdiction over Ayoub Investments-Texas, Inc., In Route Trading Company, Inc., Five Star 6021, LLC, Five Star 6305, LLC, and Jerry C. Ayoub because Plaintiffs' claims arise from Defendants transacting business in the State of Texas. This is evidenced by the fact that Ayoub Investments-Texas, Inc., In Route Trading Company, Inc. Five Star 6021, LLC, and Five Star 6305, LLC are or were Partners of Southwest Refrigerated Warehousing Services Joint Venture during the course of the Lawsuit filed against the Joint Venture, or were the subject of transfers of the interest in Southwest Refrigerated Warehousing Services Joint Venture in Texas. Plaintiffs were awarded a judgment against Southwest Refrigerated Warehousing

Services Joint Venture in the amount of $642,893.69, excluding post-judgment interest, in Cause No. 3:20-cv-0060-DB in the United States District Court Western District of Texas El Paso Division.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in this District.

**FACTS**

12. Plaintiffs contract with farmers to grow crops, including chilis, which it packages and sells to individuals and businesses nationally.

13. Plaintiffs contracted with Southwest Refrigerated Warehousing Services Joint Venture ("Southwest") to blast freeze its produce and store the frozen chili until needed at $0.025 per pound for blast freezing, $0.01 per pound for cold storage of the frozen product, and $0.011 per pour for handling.

14. Blast freezing is a process by which the product is super-chilled and quickly frozen, which is essential in decreasing the chance of growing bacteria and the possibility of spoiling.

15. By the fall of 2019, Plaintiffs had shipped about 3.4 million pounds of Chili to Southwest for blast freezing and storage. After a significant amount of chili had been shipped, Southwest advised Plaintiffs that it had an electrical problem and could not accept additional product. Southwest directed Plaintiffs to send product elsewhere and Plaintiffs complied.

16. Several days later, Southwest advised that the problem had been resolved and instructed Plaintiffs to resume shipping to Southwest. Plaintiffs complied.

17. On or about September 11, 2019, a principal of Gen5 went to Southwest to inspect and inventory their products. He discovered:

- Plaintiffs' products had not been blast-frozen;
- Some of Plaintiffs' products had not been frozen at all;
- Plaintiffs' product was being maintained at approximately 31.5 to 32.0 degrees Fahrenheit rather than the industry standard of -30 degrees Fahrenheit that is held until the product achieves a core temperature of no less than -10 degrees Fahrenheit;
- Pallets of product had been stacked haphazardly, some pallets had fallen, boxes of product had been opened, and bags of product had been opened.

18. Due to the product not being blast-frozen, Southwest promised to pay for Plaintiffs to have the product tested for food safety. The testing showed elevated levels of bacteria, consistent with failure to properly freeze the chili, making them unsellable. Southwest failed and refused to pay for the testing.

19. Plaintiffs demanded reasonable assurances that the temperature of its produce would be reduced, and the product would be solidly frozen. Southwest never provided Plaintiffs with requested reasonable assurances.

20. Plaintiffs transferred as much of its product as it could to one of Southwest's competitors.

21. Southwest emailed invoices and statements to Plaintiffs on November 13, 2019, totaling $290,000.00.

22. Plaintiffs protested the portion of the invoices which charged for blast freezing, but remitted its check for the balance, excluding the blast freezing charges. Southwest responded with a letter claiming Plaintiffs owed an outstanding balance and that

continued failure to pay was a breach of contract. If not paid, they would sell Plaintiffs' products.

23. On March 9, 2020, Southwest filed suit against Plaintiffs alleging breach of storage and guarantee agreement and breach of personal guaranty.

24. Plaintiffs then filed a counter claim against Southwest asserting causes of action for (1) breach of contract, (2) fraud, (3) usury, and (4) declaratory judgment relief.

25. The parties arbitrated the matter and the arbitrator concluded that Plaintiffs did not breach the storage and guarantee agreement or the personal guaranty, and that Southwest materially breached the contract.

26. The Court issued an order granting Plaintiffs' Supplemental Motion to Confirm Arbitration Award and Judgment Against Southwest (hereinafter "Judgment") and awarded Plaintiffs damages in the amount of $478,530.65, plus prejudgment interest in the amount of $55,588.20, plus attorneys' fees of $108,774.84 with post-judgment interest accruing at 2.94 percent per year, until paid.[1]

27. At the time the lawsuit was filed against Southwest, the partners of Southwest Refrigerated were Ayoub Investments-Texas, Inc. (hereinafter "Ayoub") and In Route Trading Company, Inc. (hereinafter "In Route").[2]

28. On January 1, 2022, after the Lawsuit against Southwest had been filed but prior to the June 27, 2022 Judgment against Southwest, Ayoub and In Route assigned their Joint

---

[1] A true and correct copy of the Judgment is attached hereto as Exhibit "A" and incorporated by reference.
[2] A true and correct copy of the Joint Venture Agreement is attached hereto as Exhibit "B" and incorporated by reference.

Venture Ownership Interest in Southwest to Five Star 6305, LLC (hereinafter "Five Star 6305") and Five Star 6021 (hereinafter "Five Star 6021"), respectively.[3]

29. Defendant Jerry C. Ayoub is the President of Defendants Ayoub and In Route, and he is the Managing Member of Defendants Five Star 6021 and Five Star 6305.[4] At all times, all of the actions of the Defendants were subject to the sole management and control of Defendant Jerry C. Ayoub.

## CAUSES OF ACTION

### Liability of Partners Pursuant to Texas Business Organizations Code § 152.304

30. Plaintiffs refer to and incorporate the paragraphs 12-29 above as if stated herein verbatim.

31. Under Texas law, "a joint venture is governed by the same rules as a partnership."[5] All partners in a partnership are joint and severally liable for all obligations of the partnership unless otherwise agreed by the claimant or provided by law.[6] A judgment against a partnership is not by itself a judgment against a partner and judgment may be entered against a partner who has been served with process in a suit against the partnership.[7] A creditor may attempt to do so in a suit against the partnership or in a separate suit, but it may not seek satisfaction of the judgment against a partner until a judgment is rendered against the partnership and 90 days have passed without collection.[8] [9]. A partner does not

---

[3] True and correct copies of the Contribution and Assignment Agreements are attached hereto as exhibit "C" and incorporated by reference.
[4] *See* exhibit C.
[5] *Enterprise Prods. Partners, L.P. v. Energy Transfer Partners, L.P.*, 529 S.W.3d 531 (Tex.App.—Dallas 2017, pet. filed)
[6] TEX. BUS. ORGS. CODE § 152.304
[7] *Id*. § 152.306
[8] *See Id*. § 152.305
[9] *See Id*. § 152.306(b)(2)(A)-(C)

have liability until partnership liability is established, so a cause of action to recover against partners accrues upon an entry of judgment against the partnership.[10]

32. Defendant Ayoub was a Partner at Southwest when the Lawsuit was filed against Southwest.[11] At all times, all of the actions of the Defendants were subject to the sole management and control of Defendant Jerry C. Ayoub.

33. Defendant In Route was a Partner at Southwest when the Lawsuit was filed against Southwest.[12]

34. Shortly before Plaintiffs received the Judgment against Southwest, Defendant Ayoub assigned its Joint Venture Ownership Interest in Southwest to Five Star 6305.[13]

35. At the same time, Defendant In Route assigned its Joint Venture Ownership Interest in Southwest to Five Star 6021.[14]

36. Southwest incurred the judgment debt owed to Plaintiffs and 90 days have passed without collection. Therefore, Defendants are joint and severally liable for the judgment awarded in favor of Plaintiffs against Southwest. As of April 26, 2023, the total amount owed on the judgment is six hundred fifty-four thousand five hundred seventy-two dollars and seventy-two cents ($654,572.72).

**FRAUDULENT TRANSFER OF PARTNERSHIP INTERESTS IN SOUTHWEST**

37. Plaintiffs refer to and incorporate the paragraphs 12-29 above as if stated herein verbatim.

38. The transfers of Defendants Ayoub and In Route's assets constitute a violation of the Texas Uniform Fraudulent Transfer Act, Texas Business & Commerce Code § 24.001, *et seq*.

[10] *See Am. Star Energy & Minerals Corp. v. Stowers*, 457 S.W.3d 427, 433 (Tex. 2015)
[11] *See* Exhibit B.
[12] *See* Exhibit B.
[13] *See* Exhibit C.
[14] *See* Exhibit C.

**A. <u>Plaintiffs' claim against Defendants Ayoub and In Route arose before the fraudulent transfers were made.</u>**[15]

39. Defendants Ayoub and In Route have had an outstanding, unresolved balance with Plaintiffs since 2022 totaling over $478,530.65.[16] Prior to the Judgment, when Plaintiffs filed their original lawsuit against Southwest in 2020, Defendants were clearly aware of the significant, outstanding balance.

**B. <u>Defendants Ayoub and In Route made transfers with actual intent to hinder, delay, and defraud Plaintiff.</u>**[17]

40. On February 26, 2020, Plaintiffs filed the Lawsuit against Southwest. After years of litigation, merely months before Plaintiffs had obtained the Judgment against Southwest**, Defendants Ayoub and In Route made transfers of their interest in Southwest to Defendants** Five Star 6021 and Five Star 6305.[18]

41. Specifically, on or about January 1, 2022, Defendants Ayoub and In Route transferred the entirety of their partnership interests in Southwest to Five Star 6305 and Five Star 6021, respectively.[19] Defendants made these transfers with the actual intent to hinder Plaintiff's ability to recover on the Judgment and in avoidance of a creditor, Plaintiff.

42. Additionally, **the transfers to Defendants Five Star 6021 and Five Star 6305 were transfers to insiders.** The term "insider" is not limited to persons and entities specifically listed in Texas Business & Organizations Code § 24.002(7). "An 'insider' is an entity whose close relationship with the debtor subjects any transactions made

---

[15] TEX. BUS. & COMM. CODE §§ 24.005(a) & 24.006(a).
[16] *See* Exhibit A.
[17] TEX. BUS. & COMM. CODE § 24.005(a)(1).
[18] *See* Exhibit C.
[19] *See* Exhibit C.

between the debtor and the insider to heavy scrutiny.[20] All Defendant entities are controlled by the same individual, Jerry C. Ayoub. This creates a close relationship between each entity. As such, the transactions should be subject to heavy scrutiny, making them insiders.

43. Further, **the value of consideration received by the debtor was not reasonably equivalent to the value of the assets transferred**. Upon information and belief, nothing of legal value was given between Five Star 6021, Five Star 6305, Ayoub, and In Route in exchange for the Interests.

44. **The transfer occurred shortly before or after a substantial debt was incurred**. The transfers were made merely a months before Plaintiffs obtained the Judgment against Southwest in the original lawsuit, after litigation had been ongoing for nearly two years.

**C. Defendants Ayoub and In Route made the transfers without receiving reasonably equivalent value in exchange for the transfers.**[21]

45. In an attempt to escape liability for the impeding Judgment against Southwest, Defendants Ayoub and In Route transferred their assets to Five Star 6305 and Five Star 6021 for, based on information and belief, no value in return.

**D. Defendants Ayoub and In Route were insolvent at the time of the transfers and/or became insolvent at the time of the transfers.**[22]

46. Defendants Ayoub and In Route were insolvent and/or became insolvent at the time the transfers described above were made. Indeed, the transfer of the Partnership interests

[20] *Tel. Equip. Network v. Ta/Westchase Place*, 80 S.W.3d 601 (Tex.App.—Houston [1st Dist.] 2002, no pet).
[21] TEX. BUS. & COMM. CODE §§ 24.005(a)(2) & 24.006(a).
[22] TEX. BUS. & COMM. CODE §§ 24.005(b)(9) & 24.006(a).

made Defendants Ayoub and In Route insolvent. Defendants Ayoub and In Route are presumed insolvent in that they have not paid the Judgment that is at issue in this cause.[23]

47. Plaintiffs have suffered damages as a result of the fraudulent transfers and are seeking the following remedies:

    a. Avoidance of the transfers to the extent necessary to satisfy the creditor's claims;

    b. Attachment of the assets transferred;

    c. An injunction against further disposition by the debtor, transferee, or both, of the assets transferred;

    d. Appointment of a receiver;

    e. Execution on the assets transferred; and/or

    f. Judgment for the value of the assets transferred at the time the assets were transferred.

    g. A finding that Defendants Five Star 6021, LLC and Five Star 6305, LLC are liable for the full amount of the Judgment against Ayoub Investments-Texas, Inc. and In Route Trading Company, Inc.

## ALTER EGO/REVERSE -VEIL PIERCING

48. Plaintiffs refer to and incorporate the paragraphs 12-47 above as if stated herein verbatim.

49. Reverse veil-piercing/alter-ego calls for holding a corporation's assets accountable for the liability of individuals who treated the corporation as their alter-ego.[24] Under this theory, the court treats the individual and corporation as one and the same.

50. Plaintiffs must show (1) that the Jerry C. Ayoub has a de facto ownership in Ayoub, In Route, Five Star 6305 and Five Star 6021; (2) that Ayoub, In Route, Five Star 6305, and

[23] *See* Tex. Bus. & Comm. Code § 24.003(b).

[24] *Zahra Spiritual Trust v. United States*, 910 F.2d 240, 243 (5th Cir. 1990).

Five Star 6021 were organized and operated as mere tools or business conduits for Jerry C. Ayoub, considering the total dealings of the Ayoub, In Route, Five Star 6305, and Five Star 6021 and Jerry C. Ayoub, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership, and control the individual maintains over the entity; and (3) whether Ayoub, In Route, Five Star 6305 and Five Star 6021 have been used for personal purposes, and whether applying reverse veil piercing would prejudice non-culpable shareholders or other stakeholders or creditors, to establish reverse veil piercing and that an entity is an alter ego.

51. Plaintiffs seek to reverse veil pierce and a obtain a judicial determination that Ayoub, In Route, Five Star 6305 and Five Star 6021 are alter egos of Jerry C. Ayoub, and essentially one in the same. Jerry C. Ayoub formed and has exclusive control and ownership in Ayoub, In Route, Five Star 6305 and Five Star 6021.[25] [26] [27] [28] Furthermore, Jerry C. Ayoub treats Ayoub, In Route, Five Star 6305 and Five Star 6021 internally as a single entity. Jerry C. Ayoub has moved assets from entity to entity in an effort to avoid creditors. These efforts to hide assets from creditors are fraudulent concealment in an attempt to deny creditors access to assets that would satisfy judgments and benefit Jerry C. Ayoub for his mischievous deeds. All of the profits and assets held by Ayoub, In Route, Five Star 6305 and Five Star 6021 are not the property of any single entity, but merely pieces for Jerry C. Ayoub to move around on a whim to safeguard and shield

[25] A true and correct copy of the Texas Secretary of State Business Organizations Inquiry for Ayoub Investments-Texas, Inc. is attached hereto as Exhibit "D" and incorporated by reference.
[26] A true and correct copy of Nevada Entity Information Page for In Route Trading Company, Inc. is attached hereto as Exhibit "E" and incorporated by reference.
[27] A true and correct copy of the Arizona Corporations Commission Entity Information Page for Five Star 6021, LLC is attached hereto as Exhibit "F" and incorporated by reference.
[28] A true and correct copy of the Arizona Corporations Commission Entity Information Page for Five Star 6305, LLC is attached hereto as Exhibit "G" and incorporated by reference.

from those Jerry C. Ayoub has harmed. Accordingly, Jerry C. Ayoub should be held liable for the entire judgment entered against Ayoub Investments-Texas, Inc. and In Route Trading Company, Inc, as well as any Judgment against Five Star 6021, LLC and Five Star 6305, LLC.

## PARTICIPATORY & VICARIOUS LIABILITY

52. Plaintiffs incorporate the foregoing allegations as if stated fully herein verbatim.

53. **Assisting or Encouraging:** Ayoub and In Route fraudulently transferred assets. Five Star 6305, Five Star 6021, and Jerry C. Ayoub had knowledge of fraudulent transfers and acted with the intent to assist Ayoub and In Route. In fact, Five Star 6305, Five Star 6021, and Jerry C. Ayoub actually assisted and encouraged the fraudulent transfers, which constitutes a substantial factor in causing the transfers. Indeed, only Jery C. Ayoub could effectuate the transfers.

54. **Assisting and Participating:** Ayoub and In Route's fraudulent transfers accomplish the purpose of evading the Judgment. Five Star 6305, Five Star 6021, and Jerry C. Ayoub provided substantial assistance in such evasion, which constitutes a substantial factor in causing the transfers.

55. **Conspiracy:** All Defendants had a meeting of the minds and came together with the objective to fraudulently transfer assets. Each of Ayoub, In Route, Five Star 6305, Five Star 6021, and Jerry C. Ayoub committed unlawful, overt acts to further their objective or course of action. Plaintiffs suffered injury as a proximate result of the wrongful acts.

56. **Joint Enterprise:** Ayoub, In Route, Five Star 6305, Five Star 6021, and Jerry C. Ayoub are engaged in a joint enterprise and engaged in fraudulent transfers while acting within the scope of the enterprise.

## ATTORNEYS' FEES

57. Plaintiffs are entitled to recover reasonable attorneys' fees and costs pursuant to TEXAS CIVIL PRACTICE REMEDIES CODE § 38.001 *et al* and TEXAS BUSINESS AND COMMERCE CODE § 24.013.

## DAMAGES

58. As direct and proximate result of Defendants' acts and omissions, Plaintiffs have suffered damages including:

a. The ordered sum of four hundred seventy-eight thousand five hundred thirty dollars and sixty-five cents ($478,530.65);

b. Pre-judgment interest in the amount of fifty-five thousand five hundred eighty-eight dollars and twenty cents ($55,588.20);

c. Post-judgment interest at the rate of two and ninety-four hundredths percent (2.94%) per year, until paid, equaling twenty-eight thousand three hundred eighty-nine dollars and fifty-eight cents ($28,389.58) as of December 22, 2023;

d. Attorneys' fees in the amount of one hundred eight thousand seven hundred seventy-four and eighty-four cents ($108,774.84);

e. Costs of court; and

f. Such other and further relief, at law or in equity, to which Plaintiffs may show themselves justly entitled.

Plaintiffs seek an award of these damages, and all future damages, as well as pre-judgment and post-judgment interest at the applicable rate.

## CONDITIONS PRECEDENT

59. All conditions precedent to Plaintiff's recovery for the cause of action stated herein have occurred, have been performed or have been executed.

## CONCLUSION AND PRAYER

Plaintiffs pray that Defendant be cited to answer and appear and that, following a trial by jury, they be awarded the following:

a. Judgment against Defendants for the actual damages sought above;

b. Pre- and post judgment interest;

d. Attorneys' fees and court costs; and

f. All other relief to which they are justly entitled.

Respectfully Submitted,

/s/ Darrell W. Cook

DARRELL W. COOK
State Bar No. 00787279
dwcook@cookkeithdavis.com
STEPHEN W. DAVIS
State Bar No. 24066792
stephen@cookkeithdavis.com
ELIZABETH C. SAMPLE
State Bar No. 24122010
elizabeth@cookkeithdavis.com
COOK KEITH & DAVIS
A PROFESSIONAL CORPORATION
6688 North Central Expressway, Suite 1000
Dallas, TX 75206
(214) 368-4686
(214) 593-5713 Telecopy

**ATTORNEYS FOR PLAINTIFF**

# EXHIBIT A

Case 3:20-cv-00060-DB Document 163 Filed 10/22/22 Page 1 of 2

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS EL**
**PASO DIVISION**

**SOUTHWEST REFRIGERATED WAREHOUSING SERVICES JOINT VENTURE,**

**Plaintiff and Counter-Defendant,**

**v.** **No. 3:20-cv-0060-DB**

**YOUNG GUNS, INC., CHRIS FRANZOY, and TAMMY FRANZOY,**

**Defendants (and Young Guns, Inc., as Counter-Claimant)**

**ORDER GRANTING DEFENDANTS' SUPPLEMENTAL MOTION TO CONFIRM ARBITRATION AWARD AND JUDGMENT AGAINST SOUTHWEST REFRIGERATED WAREHOUSING SERVICES JOINT VENTURE**

This matter came before the Court on Defendants, Young Guns, Inc., Chris Franzoy, and Tammy Franzoy's *Supplemental Motion to Confirm Arbitration Award and Enter Judgment* [Doc. 52]. The Court, having reviewed the file considered the submissions of the parties, FINDS that the motion is well-taken and should be GRANTED.

IT IS ORDERED that the Arbitrator's Post Submission Final Findings of Facts and Conclusions of Law [Doc. 46] and the Arbitrator's Award of Attorneys' Fee (Doc. 51] are confirmed.

IT IS FURTHER ORDERED that Plaintiff shall take nothing from Defendants by way of its claims against them.

IT IS FURTHER ORDERED that Plaintiff Southwest Refrigerated Warehousing Services Joint Venture shall pay Defendant Young Guns damages in the amount of $478,530.65, plus pre-

judgment interest in the amount of $55,588.20[1], plus attorneys' fees of $108,774.84, for a total of $642,893.69.[2] Post-judgment interest will accrue on this amount at the rate of two and ninety-four hundredths percent (2.94%) per year, until paid.

United States District Court Judge Briones

Prepared and submitted by:

The Law Office of Matthew Holt, P.C.

/s/ Matthew P. Holt

MATTHEW P. HOLT
NM Bar No. 1191
P.O. Box 16495
Las Cruces, NM 88004
Telephone No.: (575) 649-22493
Matt.holt@attorneyholt.com
*Attorney for Defendants/Counter-Claimant*

[1] The amount should be $51,570.64, plus $65.55 per day for every day after May 25, 2022, until the day before the Judgment is entered.

[2] This amount should be the amount filled in the blank above, plus $587,305.49 ($478,530.65 + $108,774.84).

# EXHIBIT B

EXHIBIT A

SOUTHWEST REFRIGERATED WAREHOUSING
SERVICES JOINT VENTURE

EL PASO, TEXAS

JOINT VENTURE AGREEMENT

THIS JOINT VENTURE AGREEMENT is made and entered into as of the 1st day of October, 1991, by and between NINE STAR INVESTMENTS, INC., ABRAHAM INVESTMENTS, INC., SOTOMAYOR INVESTMENTS, INC., G.W. INVESTMENTS, INC. AND REFRIGERATED WAREHOUSE VENTURE, INC., all being Texas corporations domiciled in the State of Texas.

R E C I T A L S:

WHEREAS, NINE STAR INVESTMENTS, INC., ABRAHAM INVESTMENTS, INC., SOTOMAYOR INVESTMENTS, INC., G.W. INVESTMENTS, INC. AND REFRIGERATED WAREHOUSE VENTURE, INC. (individually, a "Partner"; collectively, the "Partners") desire to form a joint venture for the purposes and upon the terms, covenants and conditions hereinafter set forth pursuant to the provisions of the Texas Uniform Partnership Act ("Act"), TEX. REV. CIV. STAT. ANN. 6132(b);

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and premises herein contained, it is mutually agreed by and between the Partners as follows:

1. ADMINISTRATIVE MATTERS

1.1 Organization. The Partners hereby form a joint venture ("Partnership") pursuant to the Act and, except as herein expressly provided to the contrary, agree to be governed in accordance therewith.

1.2 Name. The name of the Partnership shall be SOUTHWEST REFRIGERATED WAREHOUSING SERVICES or such other name or names as the Partners may from time to time determine. The business of the Partnership shall be conducted under such name and under such variations of such name as may be necessary to comply with the laws of the State of Texas or such other jurisdictions in which the Partnership shall conduct business. The Managing Partner, as defined and determined herein, shall execute all assumed or fictitious name certificates required by law to be filed in connection with the formation of the Partnership and shall cause such certificate or certificates required by law to be filed in

connection with the formation of the Partnership and shall cause such certificate or certificates to be filed in the appropriate public records. Upon the admittance of an additional Partner pursuant to the terms of Section 8 hereof, the Managing Partner shall execute an amended assumed or fictitious name certificate reflecting the addition of the new Partner to be filed in all offices where the Partnership has said certificates on file.

1.3 Principal Place of Business. The principal place of business of the Partnership shall be located at 12190 Rojas, El Paso, Texas 79927, or at such other place or places as the Partners may hereafter determine.

1.4 Nature of Partners' Obligations. As between the parties hereto, the obligations of the Partners under this Agreement shall be in every case several and shall not be, or be construed to be, either joint or joint and several. Except as otherwise expressly and specifically provided in this Agreement, none of the Partners shall have any authority to act for, or to assume any obligations or responsibility on behalf of, any other Partner or the Partnership.

1.5 Term. The Partnership shall commence as of the date hereof and shall continue in existence thereafter until December 31, 2020, unless sooner terminated in accordance with the terms of this Agreement.

## 2. BUSINESS AND PURPOSE

The purposes of the Partnership shall be to invest, own, manage, operate, sell, lease and make contracts concerning that certain tract of land situated in El Paso County, Texas, being specifically described in Exhibit "A", attached hereto and made a part hereof by reference thereto, together with real property improvements constructed thereon, (collectively, the "Property"), being generally described as a public food processing and refrigerated warehouse facility and the business of Partnership shall be limited to that extent and shall not be extended to any other activity or transaction, except by express written agreement of all Partners.

## 3. CONTRIBUTIONS TO CAPITAL

3.1 Initial Contribution to Capital. The Partners shall contribute property, money and services to the Partnership, and shall own the following respective percentages of ownership interest in the capital of the Partnership ("Ownership Percentage Interests"):

| PARTNER | OWNERSHIP PERCENTAGE INTERESTS |
|---|---|
| NINE STAR INVESTMENTS, INC. | 26% |
| REFRIGERATED WAREHOUSE VENTURE, INC. | 26% |
| SOTOMAYOR INVESTMENTS, INC. | 26% |
| ABRAHAM INVESTMENTS, INC. | 12.5% |
| G.W. INVESTMENTS, INC. | 9.5% |

The Partners shall contribute Three Hundred Thousand and No/100 Dollars ($300,000.00) cash, in accordance with their respective Ownership Percentage Interests in the Partnership, on or before October 15, 1991. Thereafter, the Partners shall contribute an additional Three Hundred Thousand and No/100 Dollars ($300,000.00) cash on or before November 30, 1991.

3.2 Additions to Capital. No Partner shall be obligated to contribute additional capital to the Partnership in excess of its initial capital contribution made pursuant to Section 3.1 above. Notwithstanding the foregoing, a vote by Partners owning in excess of Seventy Five Percent (75%) Ownership Percentage Interest (hereinafter sometimes referred to as the "requisite vote") may determine that additional contributions to the capital of the Partnership are necessary at such times and in such amounts as said requisite vote of Partners may hereafter agree to. Capital contributed by the Partners hereunder shall be so contributed in the same proportion as the Partner's Ownership Percentage Interests in the capital of the Partnership; provided, however, the Partners may make disproportionate contributions, in which event Ownership Percentage Interests shall be adjusted pursuant to Section 3.3 hereof.

3.3 Default. Should a Partner default in the obligation to make an additional contribution to the capital of the Partnership as provided in Section 3.2 above, then, the non-defaulting Partners may, at their sole option, in accordance with their Ownership Percentage Interests in the Partnership, (i) make temporary loans to the Partnership in accordance with Section 3.10 hereof; or (ii) make additional contributions to the capital of the Partnership which shall accordingly result in adjustment of the Partner's Ownership Percentage Interests in the Partnership in accordance with the percentages resulting from calculations required by Section 3.4 below.

3.4 Adjustments to Capital Accounts. Each Partner shall have a capital account maintained on a Federal tax basis which shall be increased by:

(a) The amount of cash plus the net tax basis of the property (tax basis of property less liability assumed by the Partnership) contributed or to be contributed to the capital of the Partnership pursuant to Section 3.1 above;

(b) The amount of any additional contributions to the capital of the Partnership made pursuant to Section 3.2 above; and

(c) The amount of any Partnership income and gains allocated to it, including income and gain allocated pursuant to Sections 4.1 and 4.2 below;

and which shall be decreased by:

(d) The amount of any Partnership losses and deductions allocated to it, including losses and deductions allocated pursuant to Sections 4.1 and 4.2 below; and

(e) All amounts distributed to it by the Partnership.

If the contributing Partner elects to treat his contribution as additional capital, such funds shall be allocated to his capital account. After such contributions are made, each Partner's Ownership Percentage Interest shall be adjusted and determined by dividing the aggregate capital contributions of all Partners to the Partnership since the inception of the Partnership, into the aggregate capital contributions of each Partner. The resulting quotient with respect to each Partner shall be the adjusted Ownership Percentage Interest of such Partner. Such adjusted Ownership Percentage Interest of each Partner shall supersede the Ownership Percentage Interest of such Partner as set forth in Section 3.2 above.

Loans by any Partner to the Partnership shall not be considered contributions to the capital of the Partnership. A Partner shall not be entitled to withdraw any part of its capital account or to receive any distribution from the Partnership, except as agreed by requisite vote of the Partners.

3.5 <u>No Interest on Capital Contributions.</u> No interest shall accrue or be paid to the Partners on their capital contributions to the Partnership.

3.6 <u>Return of Capital.</u> Under no circumstances shall there ever be a transfer of capital from the account of one Partner to the account of another Partner without full and adequate consideration therefor. In accordance with Section 13.3 below, upon liquidation of the Partnership, the Partners shall be entitled to their respective capital account balances.

3.7 <u>Negative Capital Account.</u> Upon dissolution of the Partnership, a Partner with a deficit balance in its capital account shall restore said deficit to the Partnership as provided in Section 13 below.

3.8 <u>Liability of Partners.</u> The Partners shall be liable, jointly and severally, for any and all debts, liabilities or other obligations of the Partnership.

3.9 <u>No Right to Property.</u> The Partners, unless otherwise agreed by requisite vote of the Partners to the contrary, shall have no right to demand or receive property other than cash in return for their capital contributions to the Partnership.

3.10 <u>Temporary Loans.</u> In the event Partnership operations require additional capital and the Partners are unwilling to make additional capital contributions in accordance with Section 3.3 above, then provided a bona fide business purpose exists for such additional capital, and said loan is approved by the requisite vote of Partners, either Partner or more than one of them may, but shall not be obligated to, advance funds to the Partnership to fund the capital needs of the Partnership. The aggregate amount of said advances shall become an obligation of the Partnership to the Partner or Partners making such loan and shall be repaid out of the income of the Partnership with adequate minimum interest as required and established as the applicable Federal rate by Section 1274 of the Internal Revenue Code of 1986, as amended ("Code"), from date of advance until repayment. Repayment shall be made as soon as sufficient income has been derived from the operation of the Partnership to permit such repayment without impairing the solvency of the Partnership, as determined by the Managing Partner, except that any such unpaid advances shall become immediately due and payable upon termination and dissolution of the Partnership. Said advances shall be deemed a loan by the contributing Partner or Partners to the Partnership and shall not be deemed a capital contribution.

## 4. PROFITS AND LOSSES

4.1 Determination of Profits and Losses. For purposes of this Agreement, the profits and losses of the Partnership shall be the profits and losses of the Partnership as determined for Federal income tax purposes.

4.2 Allocation of Profits and Losses. Except as otherwise specifically provided herein, all income, gains, losses, deductions and credits of the Partnership shall be allocated to the Partners in the same percentages as their respective Ownership Percentage Interests pursuant to Section 3.1 above. In the event any Partner shall have its Ownership Percentage Interest adjusted pursuant to Section 3.3 and/or 3.4 above, the allocation of income, gains, losses, deductions and credits shall be adjusted accordingly to reflect the change in the Partner's Ownership Percentage Interests, for purposes hereof during the term of this Agreement.

## 5. DISTRIBUTIONS

5.1 Distribution of Cash. To the extent the Partnership possesses cash, whether from operations or from the sale of Partnership properties, and all or a portion of such cash is not required for the Partnership operations, and further, provided the requisite vote of Partners is obtained, the Partners may agree to a distribution of all or a portion of such cash to the Partners from time-to-time during the term hereof. Except as provided in Section 5.2 below, or as otherwise agreed to by the Partners, distributions of cash shall be made equally among the Partners in accordance with their Ownership Percentage Interests. Cash distribution to Partners hereunder shall reduce their respective capital account balances as provided in Section 3.4 (e) above.

## 6. OWNERSHIP OF PROPERTY

All real or personal property, including all improvements placed or located thereon, contributed to or acquired by the Partnership shall be owned by the Partnership. Each Partner hereby expressly waives the right to require partition of any Partnership property or any part thereof unless said right or any restricted version thereof is reinstated by requisite vote of the Partners.

## 7. MANAGEMENT

7.1 Management of Partnership. Except as herein expressly provided to the contrary, the overall management and control of the business and affairs of the Partnership shall be vested in the

Partners, pursuant to agreement by Sixty Six and Two-Thirds Percent (66-2/3%) vote of Partners; otherwise, the Managing Partner shall make all business decisions within the scope of his power as set forth in Section 7.4 below.

7.2 Major Decisions. The following described matters (hereinafter referred to as "Major Decisions") shall require the agreement and consent of those Partners whose Ownership Percentage Interests constitute in excess of Seventy Five Percent (75%) and who are then entitled to vote thereon, to wit:

(a) The borrowing of and additional funds not described in Section 3.1 above or refinancing of any debt owned by the Partnership;

(b) The acquisition or disposition of any property;

(c) Make, construct, build or erect any improvements or developments on the Property;

(d) Entering into any contract or arrangement with any Partner or with any entity controlled by any Joint Venturer which involves the payment of any fees or compensation to such Partner or entity, except as provided hereinbelow;

(e) Taking any action in contravention of this Agreement;

(f) The confession of any judgement, or the adjustment, settlement or compromise of any claim, suit or judgement against the Partner, or make any assignment for the benefit of creditors;

(g) Taking any action that would make it impossible to carry on the business of the Partner; and

(h) The admission of any other person, firm or entity as a member of the Partnership.

Each Partner agrees not to unreasonably withhold approval or consent to any proposal made by any other Partner relating to any Major Decisions. In the event that any Partner requests in writing the approval of the other Partner to or for any purposed action within the scope of this Partner and the party to whom such request is made fails to give notice of disapproval within Ten (10) days after receipt of such request, then, in such event, such failure to respond shall be deemed to be approval of the matter for which approval was requested.

7.3 Appointment of Managing Partner. Contemporaneous with the execution hereof, the Partners have appointed and approved the designation of NINE STAR INVESTMENTS, INC. as Managing Partner. The Managing Partner shall serve for a term of one (1) year commencing as of the effective date of this Agreement and terminating upon (i) annual election of Managing Partner, which election shall take place at the Partners' Annual Meeting, during the month of January, as established by Thirty (30) days' notice from the Secretary, requiring the requisite vote of the Partners for approval; (ii) election by Managing Partner, in his sole discretion, to resign as Managing Partner; (iii) inability or incapacity of Managing Partner to serve his position; (iv) removal by requisite vote of the Partners; or (v) liquidation and dissolution of the Partnership.

7.4 Powers of Managing Partner. In connection with his management of the Partnership, the Managing Partner shall have all powers granted general partners under the Act and such additional powers as shall be specifically granted herein. The powers of the Managing Partner shall include the following:

(a) to make and enter into lease agreements for rental of Partnership properties, said agreements containing such terms, provisions and conditions including, without limitation, lease term and rent, as the Managing Partner shall approve;

(b) to enter into operating agreements with others with respect to properties and investments acquired by the Partnership containing such terms, provisions and conditions including, without limitation, terms of compensation, as the Managing Partner shall approve, including, without limitation, property repair and property management agreements;

(c) when authorized, as provided in Section 7.2 (a), to execute instruments on behalf of the Partnership in order to borrow money from lending institutions and hypothecate the assets of the Partnership to secure repayment of the borrowed sums; no lending institution to which application is made for a loan by the Managing Partner shall be required to inquire as to the purposes for which such loan is sought; and, as between this Partnership and such lending institution, it shall be conclusively presumed that the proceeds of such

loan are to be and will be used for purposes authorized under this Agreement; in this respect, the Managing Partner shall only borrow on the Partnership's line of credit described in Section 3.1 above unless further borrowings of funds are otherwise authorized by requisite vote of the Partners;

(d) to employ, retain, or otherwise secure, or enter into other contracts with personnel or firms to assist in the improvement, management and general operation of the Partnership properties, including, but not limited to, attorneys, accountants, engineers, and builders on such terms, provisions and conditions including, without limitation, terms of compensation, as the Managing Partner deems advisable;

(e) when authorized, as provided in Section 7.2 (a), to make and enter into instruments for the borrowing of funds related to the acquisition of real property, said acquisition having been approved by requisite vote of Partners, with such financial institutions as the Managing Partner shall elect;

(f) when authorized, as provided in Section 7.2 (b), to make and enter into instruments for Deeds of Trust, Security Agreements, and such other instruments as are reasonably related and necessary to and for the acquisition of real property, said acquisition having been authorized by requisite vote of Partners;

(g) to be reimbursed for all expenses incurred in conducting the Partnership business, all taxes paid by the Managing Partner in connection with the Partnership business, and all costs associated with the development, organization and operation of the Partnership;

(h) to purchase at the expense of the Partnership liability and other insurance to protect the Partnership's properties and business;

(i) when authorized, as provided in Section 7.2 (f), to execute documents to settle and compromise claims by and against the Partnership and confess judgments against the Partnership

when, in the judgment of the Managing Partner, any such act shall be in the best interests of the Partnership;

(j) to make such elections (and to undertake the representation of the Partnership in any and all tax disputes with the Internal Revenue Service) under the tax laws of the United States, the several states and other relevant jurisdictions as to the treatment of items of Partnership income, gain, loss, deduction and credit, and as to all other relevant matters as he believes necessary or desirable; and

(k) to take any and all action which is permitted under the Act and which is customary or reasonably related to the acquisition, ownership, development, improvement, management, leasing and disposition of real property, and personal and mixed property incidental thereto.

(l) to determine the times for distributions, the amount of distributions and the conditions under which distributions may be made to Partners from the Partnership, all as more specifically set forth in Section 10 of this Agreement.

No person, firm or corporation dealing with the Partnership shall be required to inquire into, or obtain any consents or other documentation as to, the authority of the Managing Partner to take any such action or to exercise any such rights or powers.

7.5 Assistant Managing Partner. The Managing Partner shall appoint and approve the designation of a Assistant Managing Partner. The Assistant Managing Partner shall serve in said capacity for a term of One (1) year commencing as of the effective date of this Agreement and terminating upon the same conditions as set forth in Section 7.3 above. The Assistant Managing Partner shall:

(a) Assist the Managing Partner in the Managing Partner's duties, as requested by the Managing Partner;

(b) Assume the duties and responsibilities of the Managing Partner when the Managing Partner is temporarily unable to do so;

(c) Be responsible for maintenance of the books of the Partnership;

(d) To deposit Partnership funds in an account or accounts to be established at such time or times in such financial institutions (including any state or federally chartered bank or savings and loan association), and authorize withdrawals of such finds by such persons, at such times, and in such amounts, as the Assistant Managing Partner may designate;

(e) As to those Partnership funds which are not then required for Partnership purposes yet which the Assistant Managing Partner deems untimely to be distributed to the Partners, to purchase either U.S. Treasury Bills, certificates of deposit or other certificates or evidences of savings account, all on such terms and for such security, if any, as the Assistant Managing Partner deems reasonable;

(f) To be reimbursed for all expenses incurred in conducting the Partnership business, and all costs associated with the development, organization and operation of the Partnership;

(g) Maintain the records of the Partnership including, without limitation, recording the minutes of Partnership meetings;

(h) Draft and maintain copies of all instruments made and entered into by the Partnership;

(i) To be responsible for receipt and disbursement of all notice provisions as required herein; and

(j) To call the annual meeting and special meetings of the Partners.

7.6 <u>No Liability/Indemnification.</u> The Managing Partner and Assistant Managing Partner shall not be liable for, and the Partnership shall indemnify the Managing Partner and Assistant Managing Partner against, liability resulting from errors in judgment or any acts or omissions, whether or not disclosed, unless caused by willful misconduct or gross negligence, as

defined by applicable law. The Partnership may carry such indemnification insurance as the Managing Partner and Assistant Managing Partner deems necessary to protect the Managing Partner and Assistant Managing Partner any other persons entitled to indemnification by the Partnership hereunder, regardless of whether the person could be indemnified under this Section 7.6.

7.7 Reimbursement. The Partnership shall pay all expenses incurred for outside professional assistance such as attorneys, accountants, resident managers, appraisers and for out-of-pocket expenses incurred by the Managing Partner and Assistant Managing Partner in connection with Partnership activities (excluding personal expenses or expenses relating to his personal interest in the Partnership rather than the Partnership business itself).

7.8 Contracts with Affiliates. The Managing Partner shall be entitled to enter into contracts, leases or transactions with one or more of his Affiliates, on terms and consideration comparable to those in similar arms-length transactions in the community. The Partners agree that any and all fees, commissions and other considerations received by any and all Affiliates pursuant to transactions or contracts permitted hereunder shall be the sole and exclusive property of the recipient, that the Partnership shall have no claim whatsoever therein, and that the participation therein by an Affiliate shall not constitute a breach by the Managing Partner or the Participant of any duty either of them may owe the Partners or the Partnership under the terms hereof or by applicable law.

7.9 Exchanges/Other Property. The Partners hereby agree that from time-to-time hereunder, the Partnership may, by requisite vote of the Partners, exchange certain Partnership assets for assets of a like-kind under Code Section 1031, or other equivalent Code Section, or acquire any other items of property.

7.10 Other Business. The Partners may engage in business ventures of any nature and description independently or with others, including, but not limited to, business of the character of or competitive with this Partnership (or any part thereof), and the Partnership shall have no rights in and to such independent ventures or other income and profits derived therefrom.

7.11 Tax Matters Partner. The Managing Partner is hereby designated as the tax matters partner of the Partnership in accordance with Code Section 6231(a)(7)(A).

7.12 Inspection of Books and Records. All Partners shall have the right to examine, in person or by agent, accountant or attorney, at any reasonable time or times, for any proper purpose,

upon Ten (10) days' written notice to the Assistant Managing Partner, the relevant books and records of the Partnership, and, at its sole cost and expense, to make extracts therefrom.

## 8. ADDITIONAL PARTNERS

8.1 Additional Partners. The Partners may agree to admit additional partners to the Partnership for such consideration as the Partners agree upon; provided, however, that any new Partner shall (i) be approved by requisite vote of the Partners prior to admission; and (ii) subsequent to said approval, sign an agreement to be bound by all terms and provisions of this Agreement and such other instruments as the Partners shall deem necessary.

## 9. ASSIGNMENT AND WITHDRAWAL

9.1 Prohibition Against Transfer. Except as provided in this Section 9, no Partner shall sell, assign, transfer, encumber or otherwise dispose of its Ownership Percentage Interest in the Partnership, or any portion thereof, without first complying with the terms and conditions set forth in this Section 9.

9.2 Withdrawal of Partner. A Partner may withdraw from the Partnership ("Withdrawing Partner") prior to the expiration of this Agreement or termination and dissolution of the Partnership by providing the Secretary Ninety (90) days' written notice of the Withdrawing Partner's intention to withdraw from the Partnership. Upon receipt of such notice, the Partners remaining in the Partnership ("Remaining Partners") shall have an exclusive option for Ninety (90) days from the date of receipt thereof to purchase, prorata in accordance with their Ownership Percentage Interests, the Withdrawing Partner's Ownership Percentage Interest. The purchase price payable for such interest being sold and purchased pursuant to the provisions hereof shall be determined as follows:

(a) The Partners shall endeavor to unanimously agree upon the value of the interest of the Partner. If the Partners cannot agree upon a value within Sixty (60) days after the event triggering the purchase, then the Partners desiring to purchase (herein called the "Purchasing Partners") the entire interest of the selling Partner (herein called the "Selling Partner") shall deliver such Selling Partner notice requiring that an investment banker be appointed to value the interest, and the Partners shall then endeavor to unanimously agree on a single investment banker. If the Partners cannot agree on a single investment banker within Thirty (30) days after the said notice shall have been delivered, then the Purchasing Partners and the Selling Partner shall each have the right to appoint one investment

banker, and the two investment bankers so appointed shall then agree upon a third investment banker to be appointed.

(b) The investment banker(s) selected as aforesaid shall have at least Ten (10) years' experience valuing interests in going concerns. The investment banker(s) so selected shall determine the then fair market value of the Selling Partner's interest in the Partnership and shall take into consideration all appropriate factors affecting the value thereof, including, but not limited to, each of the following:

(1) Lack of marketability in that the Partnership is a closely-held business entity.

(2) Restrictions on transferability under both the securities laws and this Agreement in that (i) this Agreement prohibits the transfer of an interest of a Partner without the consent a requisite vote of the Partners and (ii) the transferee is required to pay all expense related thereto.

(3) Obligation to make additional capital contributions in that each Partner and each assignee of a Ownership Percentage Interest in the Partnership may be obligated to make additional capital contributions to the Partnership under Section 3.2 hereof.

(4) Minority interest in that a minority interest is generally worth substantially less than a controlling interest.

(5) Inability to control or influence the management or operations of the partnership and inability to control or influence distributions in that the success of the Partnership's operations and the ability to share in any success in controlled by other Partners.

(6) Inability to control the distribution of cash in that no Partner and no assignee of an Ownership Percentage Interest in the Partnership has any control over the distribution of cash from the Partnership, which distribution is a Major Decision and requires a vote of more than Seventy-Five Percent (75%) of the Ownership Percentage Interests.

(7) Allocation of income in that each Partner and assignee is allocated his proportionate share of the income and gain of the Partnership, but may received no cash distribution to offset the resulting tax liability.

Each investment banker shall then certify in writing his decision as to the fair market value of the Selling Partner's interest in the Partnership, which certification shall separately address the effect of each of the aforementioned factors on the value so determined and specify the amount of the discount in value, if any, attributable to each such factor, and a copy of said certification shall be sent to all Partners in care of their respective addresses indicated hereinafter. In the event three investment bankers have been appointed, the determinations of all of the investment bankers shall then be compared. The valuation which deviates the furthest from the other two valuations shall be disregarded and the remaining two valuations shall be averaged. The average of the two valuations shall be conclusive upon the Selling Partner and the Purchasing Partners as to the value of the Selling Partner's interest in the Partnership. The fees payable for such investment banker(s) shall borne 50% by the Selling Partner and 50% by the Purchasing Partners, it being understood that each investment banker shall be a disinterested party.

(c) The purchase price payable for the Selling Partner's interest shall be equal to Eighty Percent (80%) of the total of the value of Selling Partner's interest in the Partnership as determined above (this value and the collective process of deriving this value being sometimes hereinafter referred to as the "Agreed Value"). The discount of the value of the Selling Partner's interest is not intended as a penalty but is to compensate the Partnership and the Purchasing Partners for the time, expense and hardship caused by the Selling Partner's withdrawal hereunder. The said purchase price shall be payable by the Purchasing Partners, who elect to purchase in Five (5) equal annual installments, with interest on the unpaid principal balance at the minimum allowable applicable Federal rate as set forth in the Code, at the date of closing, the first payment being due within Thirty (30) days of receipt by the Purchasing Partners of the investment banker's report. The purchase and sale of the Selling Partner's interest in the Partnership shall not impair any debt obligation of the Partnership to the Selling Partner. The Purchasing Partners shall purchase the Selling Partner's interest in such proportions as they may agree; but, however, if they cannot

agree, the Purchasing Partners shall purchase the Selling Partner's interest in the Partnership in proportion to their respective Ownership Interests.

Provided, however, if the Withdrawing Partner's entire Ownership Percentage Interest is not purchased by the Remaining Partners or third party approved by the Remaining Partners pursuant to Section 9 hereof, this shall constitute an Event of Dissolution as set forth in Section 13 of this Agreement, and Section 13 shall be determinative.

If, however, Partners with an aggregate Ownership Percentage Interest equal to or in excess of Sixty Six Percent (66%) provide notice to the Assistant Managing Partner of their election to withdraw from the Partnership, this shall constitute an Event of Dissolution, as defined in Section 13 of this Agreement; Section 13, therefore, will determinative and the Remaining Partners shall have no right of first refusal concerning purchase of the Withdrawing Partners' Ownership Percentage Interests.

The withdrawal of a Partner or Partners pursuant to this Section 9 shall not relieve the Withdrawing Partner(s) of further responsibility and liability with respect to debts and obligations of the Partnership; and, furthermore, the Withdrawing Partner shall assist in maintenance of the Partnership debt structure unless and until (i) the Withdrawing Partner's Ownership Percentage Interest shall be purchased by the Remaining Partners or third party approved by the Remaining Partners; or (ii) the Partnership shall be dissolved in accordance with Section 13 hereof.

9.3 Right of First Refusal. Any Partner desiring to sell ("Selling Partner") or otherwise dispose of or transfer all or any part of his Ownership Percentage Interest ("Offered Ownership Percentage Interest") to any person or entity shall first obtain a legally binding bona fide written offer from a person or entity to purchase all or part of the Selling Partner's Ownership Percentage Interest ("Offer"). The Selling Partner shall then (i) provide written notice to the Assistant Managing Partner and each other Partner ("Remaining Partners") of the Offer, setting forth the purchase price and a copy of the Offer and terms and provisions contained in the Offer, together with (ii) Offer and (iii) financial statements (balance sheet and income statement) of the proposed third party purchaser ("Third Party Purchaser"), said financial statements to be dated no earlier than Ninety (90) days prior to the notice date hereunder and accompanied by an Affidavit of Selling Partner and Third Party Purchaser, respectively, as to their conclusiveness and accuracy. Upon receipt of such notice and documentation, the Remaining Partners shall have an exclusive

option for a period of Thirty (30) days from the date of receipt thereof to purchase prorata, in accordance with their remaining Ownership Percentage Interests at the price and upon the terms and provisions contained in the Offer, the Offered Ownership Percentage Interest. If, at the expiration of said 30-day period, the Selling Partner still has unsold any portion of its Offered Ownership Percentage Interest, the Selling Partner may then sell all of its Offered Ownership Percentage Interest to the person or entity making the Offer; provided, however, the Partnership shall approve said third party purchaser in accordance with the terms and conditions set forth in Section 8 hereof, which consent shall not be unreasonably withheld, and the Company shall immediately return to all Remaining Partners electing to purchase a portion of the Offered Ownership Percentage Interest their purchase price, without interest. Any portion of the Offered Ownership Percentage Interest not sold within such 30-day period shall not thereafter be sold by the Selling Partner without complying with all of the foregoing provisions of this Section 9.3.

9.4 Unpaid Debt Obligations. In the event the Partnership, at the time of receipt of an Offer, shall have outstanding debt obligations, no transfer of an Ownership Percentage Interest shall occur unless and until the Third Party Purchaser or other Remaining Partner purchasing said Offered Ownership Percentage Interest shall assume, jointly and severally, the outstanding unpaid debt obligations of the Partnership secured by a pledge of the Ownership Percentage Interest to be sold; provided, however, the Partnership, by requisite vote of the Remaining Partners in its sole discretion, may require the Selling Partner to remain liable for existing debt of the Partnership until its satisfaction and release, as a condition to sale by the Selling Partner of its Ownership Percentage Interest.

Furthermore, in the event the Selling Partner, or his predecessors, have not at the time notice of said Offer is provided, paid and satisfied in full any outstanding unpaid promissory notes secured by pledge of the Ownership Percentage Interest to be sold by said Selling Partner ("Permitted Indebtedness"), as described in Section 9.6 hereof, said Offer must provide that the Third Party Purchaser or other Remaining Partner purchasing will assume and agree to pay said promissory notes in accordance with their terms.

9.5 Permitted Transfers. The foregoing provisions of this Section 9 are inapplicable to a transfer by a Partner to a corporation or other entity controlled by the Partner, or his spouse or children to a trust established by the Partner for the benefit of the Partner’s children, or, if the Partner is a corporation, a transfer from such corporate partner, to its

affiliate ("Transferee"). In any such event, the Partner shall give notice to the Secretary of the Partner's intent to make such transfer and the name of the transferee, together with a copy of the transfer instrument, to the Assistant Managing Partner. The Partnership shall notify the Partner in writing of its approval as required and determined by requisite vote of the Partners, within Thirty (30) days of the date of receipt of such notice. The Partnership may extent the period for approval up to Sixty (60) days following the date of receipt of such notice by providing written notice to the Partner Three (3) days prior to the expiration of the initial period for approval; provided, however, if the Partners shall not have approved the transfer or assignment prior to the expiration of either period, as the case may be, the Partnership shall be conclusively deemed to have approved said proposed transfer or assignment. Any such transfer, however, shall not relieve the Partner of its liability, joint and several, with respect to current or future debts of the Partnership. The Transferee shall sign a written agreement in form and substance reasonably satisfactory to the Partners agreeing to take and hold any Ownership Percentage Interest subject to, and to be bound by, all the provisions of this Agreement and to the effect that if the Transferee is liquidated, merged, combined, consolidated, sold (either through a sale or series of sales of a majority of its capital stock or substantially all of its assets), file for relief under applicable bankruptcy laws or be declared bankrupt, the Remaining Partners shall have the option for a period of Six (6) months to purchase the Ownership Percentage Interest held by such Transferee at a cash price equal to the Agreed Value, as defined herein.

9.6 <u>Pledge of Ownership Percentage Interest.</u>

(a) A Partner's Ownership Percentage Interest may not be pledged as collateral or used as security for any loan except a loan in which all of the loan proceeds are to be utilized to purchase Ownership Percentage Interest to loan or advance money to the Partnership ("Permitted Indebtedness"), unless the Partners, pursuant to a requisite vote thereof, shall have consented in writing to said pledge.

(b) In the event a Partner purchases an Ownership Percentage Interest and pledges the Ownership Percentage Interest as collateral for the Permitted Indebtedness and then defaults on such loan, the Remaining Partners shall have the prior right to purchase said Ownership Percentage Interest in accordance with terms and provisions contained in Section 9.3 hereof. Lender in accordance with the terms and provisions of the promissory note related to said Permitted Indebtedness ("Promissory Note") as required for approval of the initial transaction by the

Partnership, shall be obligated to notify the Secretary in writing if a loan contemplated under this Section 9.6 is in default within Ten (10) days after the default occurs and prior to the time such Ownership Percentage Interest is offered for sale pursuant to the Uniform Commercial Code as enacted in Texas. The Assistant Managing Partner, in turn, shall notify the Remaining Partners in accordance with the terms and provisions contained in Section 9.3 of this Agreement. The Partnership shall notify the Lender within Thirty (30) days after the Partnership received the Lender's written notice whether the Remaining Partners will assume all or any portion of the Promissory Note which is in default. If all or any portion of the Promissory Note is assumed by the Remaining Partners, the Promissory Note shall not be accelerated as to the portion assumed, the Lender, in accordance with the terms and provisions of the Promissory Note as required for approval of the initial transaction by the Partnership, shall substitute, without cost except for ordinary and reasonable attorneys' fees, any or all of the Remaining Partners as a party(ies) to the Promissory Note or substitute therefore for any portion thereof, and Lender shall be paid according to the terms and provisions of the Promissory Note or new substitute therefore.

9.7 <u>Divorce of a Partner.</u>

(a) In the event the marriage of a controlling shareholder of a Partner, the list of controlling shareholders for each Partner set forth in Exhibit "A", attached hereto, is terminated by reason of divorce ("Divorced Partner") in which the property settlement agreement or judgment of the divorce court provides that the Divorced Partner's spouse ("Spouse") shall receive any interest in the Ownership Percentage Interest owned by Divorced Partner, both the Divorced Partner and the Spouse agree that they will stipulate that the value of the Ownership Percentage Interest for purposes of such property settlement agreement or divorce court judgment shall be the book value ("Book Value"), as defined herein, of such Ownership Percentage Interest, said Book Value being binding and conclusive on all parties; and, furthermore, Spouse agrees to deliver within Ten (10) days following any decree or settlement a signed and notarized Consent to Sale to that effect to the Secretary. The Divorced partner shall have an exclusive option for a period of Thirty (30) days following his having received notice for the Partnership of delivery of the Spouse's Consent to Sale, to purchase for cash or on such terms as the Spouse may agree to any or all of his or her Spouse's Ownership Percentage Interest at Book Value. The Divorced Partner shall notify his Spouse of his election to purchase said Ownership Percentage Interest by written notice to the Spouse together with delivery to the Partnership of cash or other consideration as stipulated by the parties in an amount constituting the Purchase

Price (or prorate percentage thereof for less than all of the Spouse's interest in the Ownership Percentage Interest) with instructions that said Purchase Price be paid to his or her former Spouse upon delivery to the Partnership of a valid assignment to the Divorced Partner of such interest in the Ownership Percentage Interest.

(b) If, following the termination of exercise of the Divorced Partner's option to purchase the Spouse's interest in the Ownership Percentage Interest, there remains unsold any portion of the Ownership Percentage Interest, the Buy-Sell Procedure set forth in Section 9.3 of this Agreement shall be applicable, the purchase price being Book Value; provided, however, if following such procedures, any or all of the Spouse's interest in the Ownership Percentage Interest remain unsold, the Spouse shall continue to hold such Ownership Percentage Interest subject to the terms of this Agreement.

9.8 Bankruptcy of Partner. In the event a Partner (i) files a voluntary petition under any chapter of the Federal Bankruptcy Code or any other similar applicable Federal or state law; (ii) consents to the filing of a bankruptcy petition against him or files a petition or answer or consent seeking arrangement under the Federal Bankruptcy Code or any other similar applicable Federal or state law, or consents to the filing of any such petition; or (iii) is adjudicated a bankrupt, makes an assignment of his Ownership Percentage Interest for the benefit of creditors, or applies for or consents to the appointment of a receiver or trustee with respect to any substantial part of his assets and any such decree or order in connection with such adjudication or consent to such appointment shall have continued in force undischarged or unstayed for a period of Ten (10) days ("Bankrupt Partner"), the Bankrupt Partner and all creditors whose rights have been secured on or after the date of execution of this Agreement agree that they will stipulate that the value of the Ownership Percentage Interest owned by the Bankrupt Partner shall be the Agreed Value of such Ownership Percentage Interest, as defined in Section 9.2 hereof, said Agreed Value being binding and conclusive on all parties. The buy-sell procedure set forth in Section 9.2 of this Agreement shall be applicable; provided, however, if following such procedures, any or all of the Bankrupt Partner's Ownership Percentage Interest remains unsold, said Ownership Percentage Interest may be sold to or acquired by third party creditors provided said parties continue to hold said Ownership Percentage Interest subject to the terms of this Agreement.

9.9 Death of Partner. In the event of the death of a controlling shareholder of a Partner during the term hereof

("Deceased Partner"), the estate or other successor in interest of the Deceased Partner's Ownership Percentage Interest shall become a Partner herein and shall be bound by the terms and conditions of this Agreement; provided, however, that the Remaining Partners shall have the option for a period of Ninety (90) days from the date of death of the Deceased Partner to purchase the Deceased Partner's Ownership Percentage Interest for FMV, as defined herein, as of the date of Deceased Partner's death, and to pay to the personal representative of such Deceased Partner the value thereof in cash. During said 90-day period following the death of Deceased Partner, the Remaining Partners may continue the business of the Partnership, but the estate or personal representative of the Deceased Partner shall not be liable for any obligations incurred in the Partnership business beyond the amount includable in the estate of the Deceased Partner already invested or involved in the Partnership on the date of the Deceased Partner's death. The estate of the Deceased Partner shall be obligated to sell as provided herein and shall be entitled, at the election of the personal representative of the Deceased Partner, to either (i) that percentage of the net profits earned by the Partnership business during such 90-day period as determined by the Deceased Partner as Ownership Percentage Interest; or (ii) to interest for the use during such period of the Deceased Partner's interest in the Partnership business at the rate of Ten Percent (10%) per annum on the value of such interest determined as provided above.

9.10 Negative Capital Account. Notwithstanding anything in the foregoing to the contrary, if, following the withdrawal of a Partner from the Partnership pursuant to Section 9.2 of this Agreement or following sale of the Partnership properties and allocation of the gain or loss as provided in this Agreement, any Partner shall have a negative capital account (i.e., a debit balance in that Partner's capital account), that Partner(s) forthwith shall pay into the Partnership an amount equal to such negative capital account and that amount shall be available for distribution to the other Partners in the process of liquidation of the Partnership or continuation of the Partnership among the remaining Partners, as the case may be.

9.11 Book Value Defined. Book Value for purposes of this Agreement shall mean the book value of the Ownership Percentage Interests as of the dated Balance Sheet next preceding the Ownership Percentage Interest Offering Date calculated in accordance with Federal income tax basis, as determined by the independent certified public accountants then employed by the Partnership or an independent certified public accountant retained and appointed for the purpose of making such determination by requisite vote of the Partners.

## 10. DISTRIBUTIONS

10.1 Distributions. The Managing Partner, except as otherwise directed by requisite vote of Partners, shall determine the times for distributions, the amount of distributions, the conditions under which distributions may be made and may, in his sole and absolute discretion, retain all or part of the cash of the Partnership for any fiscal year; however, all distributions when and if made shall be made to each Partner in accordance with its Ownership Percentage Interest. The Managing Partner may set up reserves for working capital needs, additions, betterments, maintenance and replacements of property and other purposes which the Managing Partner, in his sole discretion, may deem necessary and that the Managing Partner may retain cash in the Partnership to satisfy such reserves.

## 11. FISCAL MATTERS

11.1 Partnership Year. The Partnership books and records and all required income tax returns shall be kept or made on the calendar year basis. The Partnership shall use the cash method of accounting in keeping the Partnership books and records.

11.2 Books and Records. The Assistant Managing Partner shall keep at the principal place of business and make available to the Partners at any time pursuant to Ten (10) days' written notice concerning same during normal business hours just and true books of account and all other Partnership records. The copying by the Partners or their designated agents or representatives of any part or all of such records at the personal expense of such Partner is specifically authorized.

11.3 Annual Reports. Within Ninety (90) days after the close of each fiscal year of the Partnership, the Assistant Managing Partner shall furnish to each Partner a year end balance sheet for the Partnership and a full and detailed financial report on the business operations of the Partnership for and during the entire preceding year. Each Partner shall be provided with any additional information necessary to complete his Federal and state income tax returns, including statements of the net distributable income or loss of the Partner from the operation of the Partnership. All of the above duties and services to be performed by the Assistant Managing Partner shall be deemed an expense of the Partnership.

11.4 Deposits. The Managing Partner or Assistant Managing Partner shall receive all monies of the Partnership and shall deposit the same in one or more Partnership bank accounts. All

expenditures by the managing Partner shall be made by checks drawn against the Partnership bank account(s).

11.5 Tax Elections. In the case of distribution of property of the Partnership to a Partner or transfer of the interest of a Partner in the Partnership, the Managing Partner may in his sole discretion determine whether to make the election contemplated by Section 754 of the Code to adjust the basis, for Federal income tax purposes, of property of the Partnership in the manner provided by Section 734 and 743 of the Code.

11.6 Tax Returns. The Assistant Managing Partner shall prepare, or cause to be prepared, within Ninety (90) days after the end of each fiscal year of the Partnership, a Federal income tax return for the Partnership; and, in connection therewith, shall make any available or necessary elections as he, in his sole discretion, shall deem appropriate.

11.7 Fiscal Year/Accounting Method. The Partnership shall have a fiscal year ending December 31. The Partnership shall use the cash receipts and disbursements method of accounting or such other method of accounting approved for Federal income tax purposes as adopted by requisite vote of Partners.

11.8 Bank Accounts. The Partnership shall set up such accounts with such banks as the Partners might agree. The initial Partnership bank accounts shall be established at the Texas Commerce Bank-El Paso, Texas, and International Bank of Commerce, Laredo, Texas.

## 12. POWER OF ATTORNEY

12.1 Power Granted. The Partners, by their execution hereof, hereby irrevocably constitute and appoint the Managing Partner with full power and substitution, their true and lawful attorney-in-fact, in their names, place and stead to make, execute, sign, acknowledge, record and file, on their behalf and on behalf of the Partnership, the following:

(a) A certificate of Fictitious Name and any other certificates or instruments which may be required to be filed by the Partnership or the Partners under the laws of the State of Texas and any other jurisdiction whose laws may be applicable;

(b) Any and all amendments of the certificates or instruments described in subsection (a) above, provided such amendments are

either required by law to be filed, consistent with this Agreement or deemed necessary by the Managing Partner;

(c) Such certificates, instruments and documents as may be required or appropriate in connection with the qualification of the Partnership to do business in any state or jurisdiction and the use of the name of the Partnership therein; and

(d) Any and all such other instruments as may be deemed necessary or desirable by the Managing Partner to carry out fully the provisions of this Agreement in accordance with its terms.

## 13. DISSOLUTION

13.1 Termination. The happening of any one of the following events shall work an immediate termination and dissolution of the Partnership:

(a) The sale of all the Partnership assets;

(b) The decision of the Partners, by requisite vote thereof, to dissolve the Partnership;

(c) The expiration of the term of the Partnership in accordance with Section 1.4 hereof;

(d) Withdrawal of a Partner and the failure of the Remaining Partners and/or an approved Third Party Purchaser to purchase the Withdrawing Partner's entire Ownership Percentage Interest in accordance with Section 9.2 above;

(e) Bankruptcy of a Partner, and failure of Remaining Partners and/or Third Party Purchaser to purchase the Bankrupt Partner's entire Ownership Percentage Interest in accordance with Section 9.7 hereof; and/or

(f) Withdrawal of Partners owning an aggregate Sixty Six Percent (66%) Ownership Percentage Interest.

In the event of the dissolution of the Partnership for any reason, if, following the winding up of Partnership business as provided

in Section 13.2 below, any Partner shall have a negative capital account, the provisions of Section 9.8 above shall be applicable; therefore, requiring any Partner with a negative capital account to pay into the Partnership an amount equal to such negative capital account so that such amount shall be available for distribution and liquidation pursuant to Section 13.3. below.

13.2 Winding Up. In the event of the dissolution of the Partnership for any reason, the Managing Partner shall commence to wind up the affairs of the Partnership and to liquidate its property. The Partners shall continue to share profits and losses during the period of liquidation in the same proportion as before the dissolution. The Managing Partner shall have full right and unlimited discretion, subject to directions by a requisite vote of the Partners, to determine the time, manner and terms of any sale or sales of Partnership property pursuant to such liquidation having due regard to the activity and condition of the relevant market and general financial and economic conditions. If for any reason the Managing Partner refuses to serve, or is incapable of serving, the Partners holding a majority of the ownership interest in the Partnership shall appoint or designate a Trustee in Liquidation who shall serve to wind up the affairs of the Partnership. The Trustee in Liquidation need not be a commercial corporate trustee nor be bonded.

13.3 Distributions in Liquidation. Upon the dissolution and final termination of the Partnership, the Managing Partner shall distribute the proceeds of such liquidation and any other funds of the Partnership in the following order of priorities:

(a) To the payment of debts and liabilities of the Partnership (other than those to Partners) and the expenses of liquidation;

(b) to the setting up of such reserves as the Managing Partner may reasonably deem necessary for any contingent liabilities or obligations of the Partnership;

(c) To the repayment of any advances made by the Partners to the Partnership and to any other liabilities of the Partnership to the partners; and

(d) To the Partners in accordance with their respective Ownership Percentage Interests in the Partnership.

13.4 Accounting. Within a reasonable time following the completion of the liquidation of the Partnership, the Managing Partner in cooperation with the Assistant Managing Partner shall provide the Partners with a statement prepared by the Partnership's accountants (to include preparation by the Managing Partner) which shall set forth the assets and liabilities of the Partnership as of the date of the complete liquidation and the amount distributed to each Partner by the Partnership.

13.5 Completion of Liquidation. Upon the completion of the liquidation of the Partnership and the distribution of all Partnership funds, the Partnership shall terminate and the Managing Partner shall have the authority to execute and record any other documents necessary to effectuate the dissolution and termination of the Partnership.

## 14. MISCELLANEOUS

14.1 Notices. All notices, requests, demands and other communications hereunder shall be deemed to have been duly given if personally delivered or mailed, certified mail, return receipt requested, postage prepaid.

14.2 Captions. The captions used in this Agreement are for convenience only and shall not be construed in interpreting the Agreement.

14.3 Amendments; No Waiver. No modification, amendment or waiver of this Agreement or any part hereof, shall be valid or effective unless in writing and adopted by all the Partners; and no waiver of any breach or condition of this Agreement shall be deemed to be a waiver of any other subsequent breach or condition, whether of like or different nature.

14.4 Binding Effect. This Agreement shall be binding upon and inure to the benefit of the Partners, their heirs, personal representatives, successors and permitted assigns.

14.5 Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas.

14.6 Prior Agreements Superseded. This Agreement supersedes any prior understanding or agreements, written or oral, among the parties hereto relating to the subject matter contained herein.

14.7 Invalidity. If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid, the remaining parts of the Agreement, or the application of such provisions to persons or circumstances other

than those to which it is held invalid, shall not be affected thereby.

14.8 Counterparts. This Agreement amy be executed in one or more counterparts and each of such counterparts shall, for all purposes be deemed to be an original, but all of such counterparts shall constitute one and the same Agreement, and shall be binding on all of the parties hereto, notwithstanding that all the parties are not signatories to the same counterpart.

14.9 Consent of Spouse. By execution hereof, the spouse of each Partner hereby agrees to be bound by the terms and provisions of this AGreement, and to the dispositions contemplated herein. Such spouse further waives any right of management over any interest, or portion thereof, in the Partnership.

14.10 Gender and Interpretation of Terms and Provisions. As used in this Agreement whenever required by the context thereof, each number, both singular or plural, shall include all numbers, and each gender shall include all genders. Partner, as used in this Agreement, shall include, when appropriate, the singular or plural form thereof.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement to be effective as of the ___ day of October, 1991.

NINE STAR INVESTMENTS, INC.

By: JERRY AYOUB, President

ABRAHAM INVESTMENTS, INC.

By: BRYAN ABRAHAM, President

SOTOMAYOR INVESTMENTS, INC.

By: DEMETRIO SOTOMAYOR, President

G.W. INVESTMENTS, INC.

By: MARK GRISSOM, President

REFRIGERATED WAREHOUSE VENTURE, INC.

By: SIOMA NEIMAN, President

BEING ALL OF THE PARTNERS

STATE OF TEXAS )
)
COUNTY OF EL PASO )

This instrument was acknowledged before me this 13th day of March, 1992, by Jerry Ayoub, President of NINE STAR INVESTMENTS, INC., a Texas corporation on behalf of said corporation.

NANCY GAMBOA
Notary Public
STATE OF TEXAS
My Comm. Exp. Oct. 14, 1992

NOTARY PUBLIC IN AND FOR
EL PASO COUNTY, TEXAS

This instrument was acknowledged before me this 13th day of March, 1992, by Bryan Abraham, President of ABRAHAM INVESTMENTS, INC., a Texas corporation on behalf of said corporation.

NANCY GAMBOA
Notary Public
STATE OF TEXAS
Exp. Oct. 14, 1992

NOTARY PUBLIC IN AND FOR
EL PASO COUNTY, TEXAS

This instrument was acknowledge before me this 13th day of March, 1992, by Demetrio Sotomayor, President of SOTOMAYOR INVESTMENTS, INC., a Texas corporation on behalf of said corporation.

NANCY GAMBOA
Notary Public
STATE OF TEXAS
My Comm. Exp. Oct. 14, 1992

Nancy Gamboa
NOTARY PUBLIC IN AND FOR
EL PASO COUNTY, TEXAS

This instrument was acknowledged before me this 13th day of March, 1992, by Mark Grissom, President of G.W. INVESTMENTS, INC., a Texas corporation on behalf of said corporation.

Nancy Gamboa
NOTARY PUBLIC IN AND FOR
EL PASO COUNTY, TEXAS

This instrument was acknowledged before me this 13th day of March, 1992, by Sioma Neiman, President REFRIGERATED WAREHOUSE VENTURE, INC., a Texas corporation on behalf of said corporation.

Nancy Gamboa
NOTARY PUBLIC IN AND FOR
EL PASO COUNTY, TEXAS

KO 09109110

FIRST AMENDMENT TO

JOINT VENTURE AGREEMENT

OF

SOUTHWEST REFRIGERATED WAREHOUSING SERVICES JOINT VENTURE

A TEXAS GENERAL PARTNERSHIP

THIS FIRST AMENDMENT TO JOINT VENTURE AGREEMENT of SOUTHWEST REFRIGERATED WAREHOUSING SERVICES JOINT VENTURE, a Texas General Partnership (the "First Amendment") is made and entered into effective the 1st day of November, 1994, by and between NINE STAR INVESTMENTS, INC., SOTOMAYOR INVESTMENTS, INC., REFRIGERATED WAREHOUSE VENTURE, INC., and G.W. INVESTMENTS, INC. (individually, a "Venturer"; collectively, the "Venturers"), all being Texas corporations with offices located in El Paso County, Texas.

PREAMBLE

WHEREAS, Southwest Refrigerated Warehousing Services Joint Venture (the "Joint Venture") was formed in 1991 by that certain Joint Venture Agreement, dated as of October 1, 1991, a copy thereof attached hereto as Exhibit "A", and made a part hereof by reference thereto;

WHEREAS, ABRAHAM INVESTMENTS, INC. ("Abraham"), a Texas corporation, by that certain Assignment and Assumption Agreement, dated effective November 1, 1994 (the "Assignment and Assumption Agreement"), a copy thereof attached hereto as Exhibit "B", and made a part hereof by reference thereto, assigned to the Venturers, and the Venturers assumed from Abraham, all of Abraham's Twelve and One-Half Percent (12-1/2%) Percentage Ownership Interest in the Joint Venture in accordance with the remaining Percentage Ownership Interests in the Joint Venture owned by the Venturers;

WHEREAS, the parties hereto desire to amend the Joint Venture Agreement as set forth below; provided, this First Amendment shall not serve as a release of liabilities arising under the

Joint Venture Agreement prior to amendment by this First Amendment; and

WHEREAS, terms not defined herein shall have the same meaning as in the Joint Venture Agreement;

NOW, THEREFORE, for and in consideration of the mutual promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by all parties hereto, the parties hereto further agree as follows:

A G R E E M E N T :

1. Transfer. The Venturers reconfirm that Abraham, as of the date hereof, assigned all of Abraham's Twelve and One-Half Percent (12-1/2%) Percentage Ownership Interest in the Joint Venture to the Venturers. The Venturers understand and agree to execute any and all additional documents necessary to consummate the transaction(s) contemplated by the Assignment and Assumption Agreement, in order to confirm Abraham's assignment, and the Venturers' assumption, of the Twelve and One-Half Percent (12-1/2%) Percentage Ownership Interest in the Joint Venture, as may be reasonably required to consummate the transaction(s). The Venturers agree to allocate all tax items for 1994 in accordance with the "closing of the books" method of accounting with respect to the transfer of the Twelve and One-Half Percent (12-1/2%) Percentage Ownership Interest from Abraham to the Venturers.

2. Increase in Interest. The Venturers, respectively, have acquired a prorated share of Abraham's Twelve and One-Half Percent (12-1/2%) Percentage Ownership Interest in the Joint Venture in accordance with their remaining Percentage Ownership Interests in the Joint Venture owned by the Venturers; therefore, as of the date hereof, NINE STAR INVESTMENTS, INC. has increased its Percentage Ownership Interest in the Joint Venture from Twenty Six Percent (26%) to 29.713%; SOTOMAYOR INVESTMENTS, INC. has increased its Percentage Ownership Interest in the Joint Venture from Twenty Six Percent (26%) to 29.713%; REFRIGERATED WAREHOUSE VENTURE, INC. has increased its Percentage Ownership Interest in the Joint Venture from Twenty Six Percent (26%) to 29.713%; and G.W. INVESTMENTS, INC., as of the date hereof, has increased its Percentage Ownership Interest in the Joint Venture from Nine and One-Half Percent (9-1/2%) to 10.86%. The Venturers shall be entitled from and after the date hereof to all income, gain, profits, distributions, allocations, deductions, credits and other economic, financial and tax benefits and similar items and rights attributable to their respective new Percentage Ownership

Interests in the Joint Venture. The parties hereto agree that, as of the date hereof, upon acquisition of the Twelve and One-Half Percent (12-1/2%) Percentage Ownership Interest from Abraham, the Venturers, respectively, shall be deemed to have contributed to the Joint Venture the total capital contributions previously contributed to the Joint Venture by Abraham attributable to the Twelve and One-Half Percent (12-1/2%) Percentage Ownership Interest in the Joint Venture acquired by the Venturers from Abraham.

3. Consent. All of the parties to this First Amendment hereby reconfirm their consent to: (a) the assignment of the Twelve and One-Half Percent (12-1/2%) Percentage Ownership Interest in the Joint Venture from Abraham to the Venturers; (b) the increase in the Venturers' respective Percentages of Ownership Interest in the Joint Venture as set forth below (c) the continuation of the Joint Venture; and (d) the amendment of Exhibit "A" to the Joint Venture Agreement to reflect the following Percentage Ownership Interests in the Joint Venture:

| | |
|---|---|
| Nine Star Investments, Inc. | 29.713% |
| Sotomayor Investments, Inc. | 29.713% |
| Refrigerated Warehouse Venture, Inc. | 29.713% |
| G.W. Investments, Inc. | 10.860% |

Except as amended hereby, the Joint Venture Agreement remains unmodified and in full force and effect. The Joint Venture Agreement, as amended by this First Amendment, shall be known as the "Joint Venture Agreement".

This First Amendment may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same document.

IN WITNESS WHEREOF, the undersigned have executed this First Amendment this __ day of December, 1994.

NINE STAR INVESTMENTS, INC.

By: ______________________________
JERRY C. AYOUB, PRESIDENT

SOTOMAYOR INVESTMENTS, INC.

By: ______________________________
DEMETRIO SOTOMAYOR, PRESIDENT

REFRIGERATED WAREHOUSE VENTURE, INC.

By: ______________________________
SIOMA NEIMAN, PRESIDENT

G.W. INVESTMENTS, INC.

By: ______________________________
MARK GRISSOM, PRESIDENT

KO 12289402

EXHIBIT

SECOND AMENDMENT TO

JOINT VENTURE AGREEMENT

OF

SOUTHWEST REFRIGERATED WAREHOUSING SERVICES JOINT VENTURE

A TEXAS GENERAL PARTNERSHIP

THIS SECOND AMENDMENT TO JOINT VENTURE AGREEMENT of SOUTHWEST REFRIGERATED WAREHOUSING SERVICES JOINT VENTURE, a Texas General Partnership (the "First Amendment") is made and entered into the ___ day of July, 1998 to be effective January 1, 1998 by and between NINE STAR INVESTMENTS, INC., SOTOMAYOR INVESTMENTS, INC., and G.W. INVESTMENTS, INC. (individually, a "Venturer"; collectively, the "Venturers"), all being Texas corporations with offices located in El Paso County, Texas.

PREAMBLE

WHEREAS, Southwest Refrigerated Warehousing Services Joint Venture (the "Joint Venture") was informed in 1991 by that certain Joint Venture Agreement, dated as of October 1, 1991, and amended by that certain First Amendment To Joint Venture Agreement, dated as of November 1, 1994, copies thereof attached hereto as Exhibit "A", and made a part hereof by reference thereto;

WHEREAS, Refrigerated Warehouse Venture, Inc. ("Refrigerated"), a Texas corporation, by that certain Sale and Purchase of Joint Venture Interest Agreement, dated effective January 1, 1998 (the "Sale and Purchased Agreement") a copy thereof attached hereto as Exhibit "A", and made a part hereof by reference thereto, same having been amended by that certain First to Joint Venture Agreement, dated as of November 1, 1994, a copy thereof attached hereto as Exhibit "B" and made apart hereof by reference thereto (the "Joint Venture Agreement", as amended by the First Amendment to Joint Venture Agreement, sometimes hereinafter referred to as the "Joint Venture Agreement");

WHEREAS, Refrigerated, by that certain Agreement For Sale and Purchase of Joint Venture Interest , dated effective April __ , 1998 (the "Assignment and Assumption Agreement"), a copy thereof attached hereto as Exhibit "B", and made a part hereof by reference thereto, sold, transferred and assigned to the

Venturers, and the Venturers assumed from Refrigerated, all of Refrigerated's Twenty Nine and Seven Hundred Thirteens/One Thousandths Percent (29.713%) Percentage Ownership Interest in the Joint Venture;

WHEREAS, the parties hereto desire to amend the Joint Venture Agreement as set forth below; provided, this First Amendment shall not serve as a release of liabilities arising under the Joint Venture Agreement prior to amendment by this First Amendment; and

WHEREAS, terms not defined herein shall have the same meaning as in the Joint Venture Agreement;

NOW, THEREFORE, for and in consideration of the mutual promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by all parties hereto, the parties hereto further agree as follows:

A G R E E M E N T :

1. Transfer. The Venturers reconfirm that Refrigerated as of the date hereof, assigned all of Refrigerated's Twenty Nine and Seven Hundred Thirteens/One Thousandths Percent (29.713%) Percentage Ownership Interest in the Joint Venture to the Venturers. The Venturers understand and agree to execute any and all additional documents necessary to consummate the transaction(s) contemplated by the Agreement For Sale and Purchase of Joint Venture Interest , in order to confirm Refrigerated's assignment, and the Venturers' purchase and assumption, of the Twenty Nine Seven Hundred Thirteens/One Thousandths Percent (29.713%) Percentage Ownership Interest in the Joint Venture, as may be reasonably required to consummate the transaction(s). The Venturers agree to allocate all tax items for 1998 in accordance with the "closing of the books" method of accounting with respect to the transfer of the Twenty Nine and Seven Hundred Thirteens/One Thousandths Percent (29.713%) Percentage Ownership Interest from Refrigerated to the Venturers.

2. Increase in Interest. The Venturers, respectively, have acquired a prorated share of Refrigerated's Twenty Nine and Seven Hundred Thirteens/One Thousandths Percent (29.713%) Percentage Ownership Interest in the Joint Venture in accordance with their remaining Percentage Ownership Interests in the Joint Venture owned by the Venturers; therefore, as of the date hereof, NINE STAR INVESTMENTS, INC. has increased its Percentage Ownership Interest in the Joint Venture from 29.713% to 42.274%; SOTOMAYOR INVESTMENTS, INC. has increased its Percentage Ownership

Interest in the Joint Venture from 29.713% to 42.274% and G.W. INVESTMENTS, INC., as of the date hereof, has increased its Percentage Ownership Interest in the Joint Venture from 10.861% to 15.452%. The Venturers shall be entitled from and after the date hereof to all income, gain, profits, distributions, allocations, deductions, credits and other economic, financial and tax benefits and similar items and rights attributable to their respective new Percentage Ownership Interests in the Joint Venture. The parties hereto agree that, as of the date hereof, upon acquisition of the Twenty Nine and Seven Hundred Thirteens/One Thousandths Percent (29.713%) Percentage Ownership Interest from Refrigerated, the Venturers, respectively, shall be deemed to have contributed to the Joint Venture the total capital contributions previously contributed to the Joint Venture by Refrigerated's attributable to the Twenty Nine and Seven Hundred Thirteens/One Thousandths (29.713%) Percentage Ownership Interest in the Joint Venture acquired by the Venturers from Refrigerated.

3. Consent. All of the parties to this Second Amendment hereby reconfirm their consent to: (a) the assignment of the Twenty Nine and Seven Hundred Thirteens/One Thousandths Percent (29.713%) Percentage Ownership Interest in the Joint Venture from Refrigerated to the Venturers; (b) the increase in the Venturers' respective Percentages of Ownership Interest in the Joint Venture as set forth below (c) the continuation of the Joint Venture; and (d) the amendment of Exhibit "A" to the Joint Venture Agreement to reflect the following Percentage Ownership Interests in the Joint Venture:

| | |
|---|---|
| Nine Star Investments, Inc. | 42.274% |
| Sotomayor Investments, Inc. | 42.274% |
| G.W. Investments, Inc. | 15.452% |

Except as amended hereby, the Joint Venture Agreement remains unmodified and in full force and effect. The Joint Venture Agreement, as amended by this First Amendment, shall be known as the "Joint Venture Agreement".

This First Amendment may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same document.

IN WITNESS WHEREOF, the undersigned have executed this First Amendment this __ day of July, 1998.

NINE STAR INVESTMENTS, INC.

By: ______________________________
JERRY C. AYOUB, PRESIDENT

SOTOMAYOR INVESTMENTS, INC.

By: ______________________________
DEMETRIO SOTOMAYOR, PRESIDENT

G.W. INVESTMENTS, INC.

By: ______________________________
MARK GRISSOM, PRESIDENT

KO 04089804

# THIRD AMENDMENT TO

# JOINT VENTURE AGREEMENT
# OF
# SOUTHWEST REFRIGERATED WAREHOUSING SERVICES JOINT VENTURE,

# A TEXAS GENERAL PARTNERSHIP

This Third Amendment to Joint Venture Agreement of Southwest Refrigerated Warehousing Services Joint Venture, a Texas General Partnership (the "Third Amendment") is made and entered into effective the 1st day of January, 1998, by and among Nine Star Investments, Inc, Sotomayor Investments, Inc. and G.W. Investments, Inc. (individually a "Venturer" and collectively, the "Venturers"), all being Texas corporations with offices located in El Paso County, Texas and Ayoub Investments-Texas, Inc., a Texas corporation ("Ayoub") and Ayoub Investments-Texas, Ltd., a Texas limited partnership ("Ayoub, Ltd.").

## **Recitals**

A. Southwest Refrigerated Warehousing Services Joint Venture (the "Partnership") was formed in October, 1991 by that certain Joint Venture Agreement, dated as of October 1, 1991, a copy of which is attached hereto as Exhibit "A" (the Joint Venture Agreement"), and made a part hereof by reference thereto.

B. The Joint Venture Agreement was amended by that certain First Amendment to Joint Venture Agreement (the "First Amendment") dated effective November 1, 1994, a copy thereof attached hereto as Exhibit "B", and made a part hereof by reference thereto.

C. The Joint Venture Agreement was amended by that certain Second Amendment to Joint Venture Agreement (the "Second Amendment"), dated effective January 1, 1998, a copy thereof attached hereto as Exhibit "C", and made a part hereof by reference thereto.

D. The parties hereto desire to further amend the Joint Venture Agreement as set forth below; provided, this Third Amendment shall not serve as a release of liabilities arising under the Joint Venture Agreement prior to amendment by this Third Amendment.

E. Terms not defined herein shall have the same meaning as in the Joint Venture Agreement.

## **AGREEMENT**

In consideration of the mutual promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by all parties hereto, the parties hereto further agree as follows:

1. Ratification of Transfer of Joint Venture Interest. The Venturers reconfirm that the joint venture interest held by Nine Star Investments, Inc. (Nine Star"), as of January, 1, 1998, was transferred and assigned to Ayoub Investments-Texas, Inc. ("Ayoub") pursuant to Assignment and Assumption Agreement dated to be effective January 1, 1998. It is further agreed that pursuant to a reorganization of Ayoub Investments-Texas, Inc. on December 28, 2000, all assets owned by Ayoub were transferred to Ayoub, Ltd. The Venturers agree to execute any and all additional documents necessary to consummate the transaction contemplated by the sale and purchase of joint venture interest in order to confirm the sale, transfer and assignment of the 42.274% joint venture interest held by Nine Star to Ayoub and Ayoub, Ltd. The Venturers agree to allocate all tax items for 1998 to Ayoub and as of December 28, 2000 to Ayoub, Ltd. and subsequent years in accordance with the "closing of the books" method of accounting with respect to the transfer of the 42.274% joint venture interest from Nine Star to Ayoub and Ayoub, Ltd. as the case may be.

2. Change in Interest. Ayoub shall be entitled from and after January 1, 1998, the date hereof to all income, gain, profits, distributions, allocations, deductions, credits and other economic, financial and tax benefits and similar items and rights attributable to Nine Star's prior 42.274% interest in the Joint Venture, and Ayoub, Ltd. shall be entitled to all such rights as of December 28, 2000.

3. Third Amendment. All of the parties to this Third Amendment hereby reconfirm their consent to: (a) the transfer and assignment of 42.274% joint venture interest from Nine Star to Ayoub and from Ayoub to Ayoub, Ltd.; (b) the continuation of the Partnership; and (c) the amendment of Exhibit "A" to the Joint Venture Agreement to reflect the following percentage of ownership interests in the Joint Venture:

| | |
|---|---|
| Ayoub Investments-Texas, Ltd. | 42.274% |
| Sotomayor Investments, Inc. | 42.274% |
| G.W. Investments, Inc. | 15.452% |

4. Change in Managing Joint Venturer. It is hereby agreed that as of the effective date of this Agreement, the Managing Joint Venturer under Section 7.3 of the Joint Venture Agreement shall be Ayoub Investments-Texas, Ltd. through its general partner, Ayoub Management, L.L.C.

5. Election as a Limited Liability Partnership. The Venturers hereby agree that the Joint Venture shall elect to become a limited liability partnership pursuant to section 3.08 (b) of the Texas Revised Partnership Act. Jerry Ayoub, as President of Ayoub Management, L.L.C., the General Partner of Ayoub, Ltd., the Managing Joint Venturer, is hereby authorized to file the Application for Registered Limited Liability Partnership and to maintain the election on an annual basis.

6. Change of Name of the Joint Venture. Upon the filing and acceptance of the Application For Registered Limited Liability Partnership, the name of the Joint Venture shall be Southwest Refrigerated Warehousing Services, L.L.P.

7. Compliance with Section 3.08 (d) (i) of the Act. The Partnership shall make arrangements, so long as the Partnership shall remain a registered limited liability partnership, to carry statutorily required liability insurance to cover the kinds of errors, omissions, negligence, incompetence, or malfeasance for which liability is limited under the Act.

8. Liability of the Venturers. Section 3.8 of the Joint Venture Agreement is amended to provide that so long as the Partnership remains a registered limited liability partnership, the Venturers shall not be individually liable, directly or indirectly, by contribution, indemnity, or otherwise, for debts and obligations of the partnership.

Except as amended by the First Amendment, Second Amendment and hereby, the Joint Venture Agreement remains unmodified and in full force and effect.

This Third Amendment may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same document.

IN WITNESS WHEREOF, the undersigned have executed this Third Amendment to be effective November 1, 2001.

**NINE STAR INVESTMENTS, INC.**

By:____________________
Name: Jerry Ayoub
Title: President

**AYOUB INVESTMENTS-TEXAS, INC.**

By:____________________
Name: Jerry Ayoub
Title: President

**AYOUB INVESTMENTS-TEXAS, LTD.**

BY: Ayoub Management, L.L.C.,
its General Partner

By:____________________
Name: Jerry Ayoub
Title: President

**SOTOMAYOR INVESTMENTS, INC.**

By: ______________________
Name: Demetrio Sotomayor
Title: President

**G.W. INVESTMENTS, INC.**

By: ______________________
Name: Mark Grissom
Title: President

**FOURTH AMENDMENT**
**TO**
**JOINT VENTURE AGREEMENT**
**OF**
**SOUTHWEST REFRIGERATED WAREHOUSING SERVICES JOINT VENTURE, A TEXAS GENERAL PARTNERSHIP**

THIS FOURTH AMENDMENT TO JOINT VENTURE AGREEMENT OF SOUTHWEST REFRIGERATED WAREHOUSING SERVICES JOINT VENTURE, A TEXAS GENERAL PARTNERSHIP (the "Fourth Amendment") is made and entered into as of February 1, 2005 (the "Effective Date") by and among AYOUB INVESTMENTS-TEXAS, INC., a Delaware corporation, formerly known as Ayoub Investments-Texas, Ltd., a Texas limited partnership, and IN ROUTE TRADING COMPANY, INC., a Nevada corporation (individually, a "Venturer" and collectively, the "Venturers").

RECITALS

A. Southwest Refrigerated Warehousing Services Joint Venture (the "Partnership") was formed in October, 1991, by that certain Joint Venture Agreement dated as of October 1, 1991 (the "Joint Venture Agreement"), a copy of which is attached hereto as Exhibit "A"; and

B. The Joint Venture Agreement was amended by that certain First Amendment to Joint Venture Agreement dated effective November 1, 1994 (the "First Amendment"), a copy of which is attached hereto as Exhibit "B" and incorporated herein by reference; and

C. The Joint Venture Agreement was amended by that certain Second Amendment to Joint Venture Agreement dated effective January 1, 1998 (the "Second Amendment"), a copy of which is attached hereto as Exhibit "C" and incorporated herein by reference; and

D. The Joint Venture Agreement was amended by that certain Third Amendment to Joint Venture Agreement dated effective January 1, 1998 (the "Third Amendment"), a copy of which is attached hereto as Exhibit "D" and incorporated herein by reference; and

E. The parties hereto desire to further amend the Joint Venture Agreement as set forth below; provided, however, this Fourth Amendment shall not serve as a release of liabilities arising under the Joint Venture Agreement prior to amendment by this Fourth Amendment; and

F. The terms not defined herein shall have the same meaning as in the Joint Venture Agreement.

AGREEMENT

In consideration of the mutual promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by all parties hereto, the parties hereto further agree as follows:

1. Ratification of Transfer of Joint Venture Interest. The Venturers reconfirm that: (a) the joint venture interest owned and held by Sotomayor Investments, Inc. has been transferred to Ayoub Investments-Texas, Inc. and In Route Trading Company, Inc. pursuant to a Purchase and Sale Agreement dated as of December 31, 2004, and (b) the joint venture interest owned and held by G. W. Investments, Inc. has been transferred to Ayoub Investments-Texas, Inc. and In Route Trading Company, Inc. pursuant to a Purchase and Sale Agreement dated as of January 31, 2005. The parties agree to execute any and all additional documents necessary to consummate such transfers. The Purchase and Sale Agreements, respectively, address all rights, liabilities and remedies of the parties.

2. Change in Interest. From and after December 31, 2004, Ayoub Investments-Texas, Inc. and In Route Trading Company, Inc. shall be entitled to all income, gain, profits, distributions, allocations, deductions, credits and other economic, financial and tax benefits and similar items and rights attributable to Sotomayor Investments, Inc. From and after January 31, 2005, Ayoub Investments-Texas, Inc. and In Route Trading Company, Inc. shall be entitled to all income, gain, profits, distributions, allocations, deductions, credits and other economic, financial and tax benefits and similar items and rights attributable to G. W. Investments, Inc.

3. Fourth Amendment. All of the parties to this Fourth Amendment hereby reconfirm their consent to: (a) the transfer and assignment of the joint venture interest of Sotomayor Investments, Inc. to Ayoub Investments-Texas, Inc. and In Route Trading Company, Inc.; (b) the transfer and assignment of the joint venture interest of G. W. Investments, Inc. to Ayoub Investments-Texas, Inc. and In Route Trading Company, Inc.; (c) the continuation of the Partnership; and (d) the amendment of Exhibit "A" to the Joint Venture Agreement to reflect the following percentage of ownership interests in the Joint Venture:

| | |
|---|---|
| Ayoub Investments-Texas, Inc. | 99% |
| In Route Trading Company, Inc. | 1% |

4. Ratification of Managing Joint Venturer. The parties reconfirm that the Managing Joint Venturer under Section 7.3 of the Joint Venture Agreement shall continue to be Ayoub Investments-Texas, Inc.

Except as amended by the First Amendment, Second Amendment, Third Amendment and hereby, the Joint Venture Agreement remains unmodified and in full force and effect.

This Fourth Amendment may be executed in counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same document.

IN WITNESS WHEREOF, the undersigned have executed this Fourth Amendment to be effective as of the date first set forth above.

**(SIGNATURES ON THE FOLLOWING PAGE)**

**AYOUB INVESTMENTS-TEXAS, INC.,**
a Delaware corporation

By: ______________________________
Jerry C. Ayoub
Its President

**IN ROUTE TRADING COMPANY, INC.,**
a Nevada corporation

By: ______________________________
Jerry C. Ayoub
Its President

EXHIBIT "A"

JOINT VENTURE AGREEMENT

EXHIBIT "B"

FIRST AMENDMENT TO JOINT VENTURE AGREEMENT

EXHIBIT "C"

SECOND AMENDMENT TO JOINT VENTURE AGREEMENT

EXHIBIT "D"

THIRD AMENDMENT TO JOINT VENTURE AGREEMENT

# EXHIBIT C

# CONTRIBUTION AND ASSIGNMENT AGREEMENT

This Contribution and Assignment Agreement (the "*Agreement*") is entered into effective the 1 day of January, 2022 (the "*Effective Date*"), by and between **AYOUB INVESTMENTS – TEXAS, INC.**, a Delaware corporation ("*Ayoub Investments*"), and **FIVE STAR 6305, LLC**, an Arizona limited liability company ("*Five Star 6305*") (each a "*Party*" and collectively, the "*Parties*").

## WITNESSETH:

**WHEREAS**, Ayoub Investments owns a ninety-nine percent (99%) general partnership interest (the "*Ownership Interest*") in the joint venture known as SOUTHWEST REFRIGERATED WAREHOUSING SERVICES JOINT VENTURE, a Texas joint venture (the "*Joint Venture*"); and

**WHEREAS**, Ayoub Investments desires to contribute, transfer and assign the Ownership Interest in the Joint Venture to Five Star 6305; and

**WHEREAS**, Five Star 6305 desires to accept Ayoub Investment's contribution of the Ownership Interest upon the terms contained herein.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties to this Agreement hereby agree as follows:

1. **Assignment of the Joint Venture Ownership Interest.** For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Ayoub Investments does hereby contribute, transfer, assign, set over and deliver the Ownership Interest in the Joint Venture to Five Star 6305 as a capital contribution to Five Star 6305, together with all rights and all sums now due or to otherwise become due to Five Star 6305 with respect to such Ownership Interest in the Joint Venture.

2. **Assumption of Rights and Obligations.** Five Star 6305 hereby acknowledges and agrees that it is assuming all of Ayoub Investments rights, liabilities, and obligations with respect to the Ownership Interest in the Joint Venture herein assigned arising from and after the Effective Date. Five Star 6305 expressly acknowledges the terms and conditions of the Joint Venture Agreement of Southwest Refrigerated Warehousing Services Joint Venture, dated as of October 1, 1991, as amended (the "*Joint Venture Agreement*"), and agrees to be bound by and observe and comply with the terms thereof from and after the Effective Date, and Five Star 6305 shall be admitted as a general partner of the Joint Venture for all purposes.

3. **Benefits.** All of the terms and provisions of this Agreement shall inure to and be binding upon Ayoub Investments, Five Star 6305, and the Joint Venture and their respective successors and assigns.

4. **Further Action.** This Agreement serves as an assignment of the ownership interests as set forth herein. The undersigned Parties shall execute and deliver such other documents as may be necessary to accomplish the respective contribution and assignment described in this Agreement.

5. **Miscellaneous.**

(a) **Governing Law.** This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without regard to the conflict of law principles thereof. Any action or proceeding seeking to enforce any provision of, or based on any right or obligation arising out of this Agreement, must be brought against a Party in an applicable court located in the City of El Paso, El Paso County, Texas, and each Party to this Agreement hereby irrevocably waives, to the fullest extent

permitted by law, any objection that each Party may now or hereafter have to the laying of venue in any such applicable court and any claim that any such applicable court is an inconvenient forum.

(b) **Entire Agreement.** This Agreement sets forth the entire understanding of the Parties with respect to the agreements stated herein, and supersedes all prior agreements, arrangements and understandings relating to the subject hereof.

(c) **Amendment; Waiver.** This Agreement may not be amended or any provision hereof waived, except by an instrument in writing executed by the Parties to this Agreement.

(d) **Legal Construction.** In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal, void as against public policy, or unenforceable in any other respect and is not otherwise reformed, such invalidity, illegality, voidability, or unenforceability shall not affect any other provision hereof and this Agreement shall be construed as if such invalid, illegal, void, or unenforceable provision had never been contained herein. Furthermore, such invalid, illegal, void, or unenforceable provision shall be fully severable, without affecting the remaining valid, legal, and enforceable provisions. In lieu of the invalid, illegal, void, or unenforceable provision, there shall be added a provision as similar in terms and legal effect as the invalid, illegal, void, or unenforceable provision as may be possible and which may be valid, legal and enforceable.

(e) **Costs.** If any legal action or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing Party or Parties shall be entitled to recover reasonable attorney's fees and expenses incurred in such action or proceeding, in addition to any other relief to which such Party or Parties may be entitled.

(g) **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement. To facilitate the execution of this Agreement, facsimile, electronic and e-mail/scanned signatures shall be as binding as originals.

(*Signature Page Follows*)

**EXECUTED** to be effective as of the Effective Date.

**AYOUB INVESTMENTS:**

**AYOUB INVESTMENTS-TEXAS, INC.,**
a Delaware corporation

By: ______________________
**Jerry C. Ayoub**, President

**FIVE STAR 6305:**

**FIVE STAR 6305, LLC,**
an Arizona limited liability company

By: ______________________
**Jerry C. Ayoub**, Managing Member

**AGREED AND ACCEPTED BY THE JOINT VENTURE:**

**SOUTHWEST REFRIGERATED WAREHOUSING SERVICES JOINT VENTURE**

By; **IN ROUTE TRADING COMPANY, INC.,**
a Nevada corporation
Its: Joint Venturer

By: ______________________
Jerry C. Ayoub, President

By; **AYOUB INVESTMENTS – TEXAS, INC.,**
A Delaware corporation
Its: Joint Venturer

By: ______________________
Jerry C. Ayoub, President

# CERTIFIED COPY OF RESOLUTIONS AUTHORIZING CONTRIBUTION OF INTEREST

The undersigned, constituting the President of Ayoub Investments-Texas, Inc., a Delaware corporation (the "***Corporation***"), does hereby certify that the Corporation has adopted the following resolutions to be recorded in the minute books of the Corporation, and are in accord with and pursuant to the Corporation's organizational documents and are now in full force and effect, to wit:

**RESOLVED,** that the Corporation is hereby authorized to contribute the Corporation's entire general partnership interest in Southwest Refrigerated Warehousing Services Joint Venture, a Texas general partnership, to Five Star 6305, LLC, an Arizona limited liability company, as a capital contribution (the "***Contribution***"); and

**FURTHER RESOLVED,** that to the extent of any restrictions in the Corporation's Bylaws, the Corporation and the board of directors of the Corporation consent to the Contribution and waive any transfer restrictions contained in the Corporation's bylaws; and

**FURTHER RESOLVED,** that, Jerry C. Ayoub, as President of the Corporation, is authorized to executed any documents and take any other actions as may be reasonable to effectuate the Contribution.

**IN WITNESS WHEREOF**, I have hereunto subscribed my name as the President of the Corporation effective the 1 day of January 2022.

**PRESIDENT:**

[signature]

**JERRY C. AYOUB**, President of
Ayoub Investments-Texas, Inc.

**LIMITED LIABILITY COMPANY RESOLUTIONS**
**REGARDING ACCEPTANCE OF CAPITAL CONTRIBUTIONS**

The undersigned, constituting the Managing Member (the "***Member***") of Five Star 6305, LLC, an Arizona limited liability company (the "***Company***"), does hereby unanimously adopt the following resolutions to be recorded in the minute books of the Company, and are in accord with and pursuant to the Company's Articles of Organization and Operating Agreement and are now in full force and effect, to wit:

**RESOLVED**, the Company is hereby authorized to accept the capital contribution by Ayoub Investments-Texas, Inc., a Delaware corporation ("***Ayoub Investments***") of Ayoub Investments ninety-nine percent (99%) general partnership interest in Southwest Refrigerated Warehousing Services Joint Venture, a Texas general partnership (the "***Contribution***"); and

**FURTHER RESOLVED,** that Jerry C. Ayoub, the managing member of the Company, is authorized to execute all documents and to take any other action as may be reasonable to effectuate the Contribution; and

**FURTHER RESOLVED,** that all actions taken prior to the effective date of these Limited Liability Company Resolutions by the Company and its managing member, Jerry C. Ayoub, on behalf of and as the act and deed of the Company with respect to the acceptance of the Contribution described herein are hereby approved, adopted and ratified in every respect; and

**FURTHER RESOLVED** that these Limited Liability Resolutions may be executed in multiple counterparts, each of which shall be deemed to be an original, and all which, when taken together, shall constitute one and the same document. To facilitate the execution of these Limited Liability Resolutions, facsimile, electronic and e-mail/scanned signatures shall be as binding as originals.

**IN WITNESS WHEREOF**, the undersigned, constituting the managing member of the Company has executed these resolutions effective the 1 day of January 2022.

**MEMBER**:

[signature]

**JERRY C. AYOUB**, Managing Member
of Five Star 6305, LLC

**CONTRIBUTION AND ASSIGNMENT AGREEMENT**

This Contribution and Assignment Agreement (the "*Agreement*") is entered into effective the 1 day of January, 2022 (the "*Effective Date*"), by and between **JERRY C. AYOUB**, individually ("*Mr. Ayoub*"), and **AYOUB INVESTMENTS – TEXAS, INC.**, a Delaware corporation ("*Ayoub Investments*") (each a "*Party*" and collectively, the "*Parties*").

**W I T N E S S E T H:**

**WHEREAS**, Mr. Ayoub owns one hundred percent (100%) of the membership interest (the "*Ownership Interest*") in Five Star 6305, LLC, an Arizona limited liability company (the "*Company*"); and

**WHEREAS**, Mr. Ayoub owns one hundred percent (100%) of the ownership interest in Ayoub Investments; and

**WHEREAS**, Mr. Ayoub desires to contribute, transfer and assign the Ownership interest in the Company to Ayoub Investments; and

**WHEREAS**, Ayoub Investments desires to accept Mr. Ayoub's contribution of the Ownership Interest upon the terms contained herein.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties to this Agreement hereby agree as follows:

**1. Assignment of the Joint Venture Ownership Interest.** For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Mr. Ayoub does hereby contribute, transfer, assign, set over and deliver the Ownership Interest in the Company to Ayoub Investments as a capital contribution to Ayoub Investments, together with all rights and all sums now due or to otherwise become due to Ayoub Investments with respect to such Ownership Interest in the Company.

**2. Assumption of Rights and Obligations.** Ayoub Investments hereby acknowledges and agrees that it is assuming all of Mr. Ayoub's rights, liabilities, and obligations with respect to the Ownership Interest in the Company herein assigned arising from and after the Effective Date. Ayoub Investments expressly acknowledges the terms and conditions of the Operating Agreement for Five Star 6035, LLC, dated effective ________________ (the "*Operating Agreement*"), and agrees to be bound by and observe and comply with the terms thereof from and after the Effective Date, and Ayoub Investments shall be admitted as a member of the Company for all purposes.

**3. Benefits.** All of the terms and provisions of this Agreement shall inure to and be binding upon Mr. Ayoub, Ayoub Investments, and the Company and their respective heirs, executors, administrators, successors and assigns.

**4. Further Action.** This Agreement serves as an assignment of the ownership interests as set forth herein. The undersigned Parties shall execute and deliver such other documents as may be necessary to accomplish the respective contribution and assignment described in this Agreement.

**5. Miscellaneous.**

**(a) Governing Law.** This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without regard to the conflict of law principles thereof. Any action or proceeding seeking to enforce any provision of, or based on any right or obligation arising out of this Agreement, must be brought against a Party in an applicable court located in the City of El Paso, El Paso

County, Texas, and each Party to this Agreement hereby irrevocably waives, to the fullest extent permitted by law, any objection that each Party may now or hereafter have to the laying of venue in any such applicable court and any claim that any such applicable court is an inconvenient forum.

**(b)** **Entire Agreement.** This Agreement sets forth the entire understanding of the Parties with respect to the agreements stated herein, and supersedes all prior agreements, arrangements and understandings relating to the subject hereof.

**(c)** **Amendment; Waiver.** This Agreement may not be amended or any provision hereof waived, except by an instrument in writing executed by the Parties to this Agreement.

**(d)** **Legal Construction.** In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal, void as against public policy, or unenforceable in any other respect and is not otherwise reformed, such invalidity, illegality, voidability, or unenforceability shall not affect any other provision hereof and this Agreement shall be construed as if such invalid, illegal, void, or unenforceable provision had never been contained herein. Furthermore, such invalid, illegal, void, or unenforceable provision shall be fully severable, without affecting the remaining valid, legal, and enforceable provisions. In lieu of the invalid, illegal, void, or unenforceable provision, there shall be added a provision as similar in terms and legal effect as the invalid, illegal, void, or unenforceable provision as may be possible and which may be valid, legal and enforceable.

**(e)** **Costs.** If any legal action or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing Party or Parties shall be entitled to recover reasonable attorney's fees and expenses incurred in such action or proceeding, in addition to any other relief to which such Party or Parties may be entitled.

**(g)** **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement. To facilitate the execution of this Agreement, facsimile, electronic and e-mail/scanned signatures shall be as binding as originals.

(*Signature Page Follows*)

**EXECUTED** to be effective as of the Effective Date.

**MR. AYOUB:**

JERRY C. AYOUB, individually

**AYOUB INVESTMENTS:**

**AYOUB INVESTMENTS – TEXAS, INC.**,
a Delaware corporation

By: Jerry C. Ayoub, President

**AGREED AND ACCEPTED BY THE COMPANY:**

**FIVE STAR 6305, LLC**,
an Arizona limited liability company

By: Jerry C. Ayoub, Managing Member

**CERTIFIED COPY OF RESOLUTIONS**
**AUTHORIZING ACCEPTANCE OF CONTRIBUTION OF INTEREST**

The undersigned, constituting the President of Ayoub Investments-Texas, Inc., a Delaware corporation (the "***Corporation***"), does hereby certify that the Corporation has adopted the following resolutions to be recorded in the minute books of the Corporation, and are in accord with and pursuant to the Corporation's organizational documents and are now in full force and effect, to wit:

**RESOLVED**, that the Corporation is hereby authorized to accept the contribution of Jerry C. Ayoub's one hundred percent (100%) membership interest in Five Star 6305, LLC, an Arizona limited liability company (the "***Contribution***"); and

**FURTHER RESOLVED,** that to the extent of any restrictions in the Corporation's Bylaws, the Corporation and the board of directors of the Corporation consent to the Contribution and waive any restrictions contained in the Corporation's bylaws; and

**FURTHER RESOLVED,** that, Jerry C. Ayoub, as President of the Corporation, is authorized to executed any documents and take any other actions as may be reasonable to effectuate the Contribution.

**IN WITNESS WHEREOF**, I have hereunto subscribed my name as the President of the Corporation effective the 1 day of January, 2022.

**PRESIDENT:**

**JERRY C. AYOUB**, President of
Ayoub Investments-Texas, Inc.

**LIMITED LIABILITY COMPANY RESOLUTIONS**
**REGARDING MEMBER'S CONTRIBUTION**

The undersigned, constituting the Managing Member (the "***Member***") of Five Star 6305, LLC, an Arizona limited liability company (the "***Company***"), does hereby unanimously adopt the following resolutions to be recorded in the minute books of the Company, and are in accord with and pursuant to the Company's Articles of Organization and Operating Agreement and are now in full force and effect, to wit:

**RESOLVED**, the Member of the Company hereby authorizes the Member's contribution of the Member's one hundred percent (100%) membership interest in the Company to Ayoub Investments (the "***Contribution***").

**FURTHER RESOLVED,** that Jerry C. Ayoub, the managing member of the Company, is authorized to execute all documents and to take any other action as may be reasonable to effectuate the Contribution; and

**FURTHER RESOLVED,** that all actions taken prior to the effective date of these Limited Liability Company Resolutions by the Company and its managing member, Jerry C. Ayoub, on behalf of and as the act and deed of the Company with respect to the acceptance of the Contribution described herein are hereby approved, adopted and ratified in every respect; and

**FURTHER RESOLVED** that these Limited Liability Resolutions may be executed in multiple counterparts, each of which shall be deemed to be an original, and all which, when taken together, shall constitute one and the same document. To facilitate the execution of these Limited Liability Resolutions, facsimile, electronic and e-mail/scanned signatures shall be as binding as originals.

**IN WITNESS WHEREOF**, the undersigned, constituting the managing member of the Company has executed these resolutions effective the 1 day of January 2022.

**MEMBER**:

[signature]

**JERRY C. AYOUB**, Managing Member
of Five Star 6305, LLC

**CONTRIBUTION AND ASSIGNMENT AGREEMENT**

This Contribution and Assignment Agreement (the "*Agreement*") is entered into effective the 1 day of January, 2022 (the "*Effective Date*"), by and between **IN ROUTE TRADING COMPANY, INC.**, a Nevada corporation ("*In Route*"), and **FIVE STAR 6021, LLC**, an Arizona limited liability company ("*Five Star 6021*") (each a "*Party*" and collectively, the "*Parties*").

**WITNESSETH:**

**WHEREAS**, In Route owns a one percent (1%) general partnership interest (the "*Ownership Interest*") in the joint venture known as SOUTHWEST REFRIGERATED WAREHOUSING SERVICES JOINT VENTURE, a Texas joint venture (the "*Joint Venture*"); and

**WHEREAS**, In Route desires to contribute, transfer and assign the Ownership Interest in the Joint Venture to Five Star 6021; and

**WHEREAS**, Five Star 6021 desires to accept In Route's contribution of the Ownership Interest upon the terms contained herein.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties to this Agreement hereby agree as follows:

1. **Assignment of the Joint Venture Ownership Interest.** For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, In Route does hereby contribute, transfer, assign, set over and deliver the Ownership Interest in the Joint Venture to Five Star 6021 as a capital contribution to Five Star 6021, together with all rights and all sums now due or to otherwise become due to Five Star 6021 with respect to such Ownership Interest in the Joint Venture.

2. **Assumption of Rights and Obligations.** Five Star 6021 hereby acknowledges and agrees that it is assuming all of In Route's rights, liabilities, and obligations with respect to the Ownership Interest in the Joint Venture herein assigned arising from and after the Effective Date. Five Star 6021 expressly acknowledges the terms and conditions of the Joint Venture Agreement of Southwest Refrigerated Warehousing Services Joint Venture, dated as of October 1, 1991, as amended (the "*Joint Venture Agreement*"), and agrees to be bound by and observe and comply with the terms thereof from and after the Effective Date, and Five Star 6021 shall be admitted as a general partner of the Joint Venture for all purposes.

3. **Benefits.** All of the terms and provisions of this Agreement shall inure to and be binding upon In Route, Five Star 6021, and the Joint Venture and their respective successors and assigns.

4. **Further Action.** This Agreement serves as an assignment of the ownership interests as set forth herein. The undersigned Parties shall execute and deliver such other documents as may be necessary to accomplish the respective contribution and assignment described in this Agreement.

5. **Miscellaneous.**

(a) **Governing Law.** This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without regard to the conflict of law principles thereof. Any action or proceeding seeking to enforce any provision of, or based on any right or obligation arising out of this Agreement, must be brought against a Party in an applicable court located in the City of El Paso, El Paso County, Texas, and each Party to this Agreement hereby irrevocably waives, to the fullest extent permitted by law, any objection that each Party may now or hereafter have to the laying of venue in any such applicable court and any claim that any such applicable court is an inconvenient forum.

**(b)** **Entire Agreement.** This Agreement sets forth the entire understanding of the Parties with respect to the agreements stated herein, and supersedes all prior agreements, arrangements and understandings relating to the subject hereof.

**(c)** **Amendment; Waiver.** This Agreement may not be amended or any provision hereof waived, except by an instrument in writing executed by the Parties to this Agreement.

**(d)** **Legal Construction.** In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal, void as against public policy, or unenforceable in any other respect and is not otherwise reformed, such invalidity, illegality, voidability, or unenforceability shall not affect any other provision hereof and this Agreement shall be construed as if such invalid, illegal, void, or unenforceable provision had never been contained herein. Furthermore, such invalid, illegal, void, or unenforceable provision shall be fully severable, without affecting the remaining valid, legal, and enforceable provisions. In lieu of the invalid, illegal, void, or unenforceable provision, there shall be added a provision as similar in terms and legal effect as the invalid, illegal, void, or unenforceable provision as may be possible and which may be valid, legal and enforceable.

**(e)** **Costs.** If any legal action or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing Party or Parties shall be entitled to recover reasonable attorney's fees and expenses incurred in such action or proceeding, in addition to any other relief to which such Party or Parties may be entitled.

**(g)** **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement. To facilitate the execution of this Agreement, facsimile, electronic and e-mail/scanned signatures shall be as binding as originals.

(*Signature Page Follows*)

**EXECUTED** to be effective as of the Effective Date.

**AYOUB INVESTMENTS:**

**IN ROUTE TRADING COMPANY, INC.**,
a Nevada corporation

By: ______________________
Jerry C. Ayoub, President

**FIVE STAR 6021:**

**FIVE STAR 6021, LLC**,
an Arizona limited liability company

By: ______________________
Jerry C. Ayoub, Managing Member

**AGREED AND ACCEPTED BY THE JOINT VENTURE:**

**SOUTHWEST REFRIGERATED WAREHOUSING SERVICES JOINT VENTURE**

By; **IN ROUTE TRADING COMPANY, INC.**,
a Nevada corporation
Its: Authorized Venturer

By: ______________________
Jerry C. Ayoub, President

By; **AYOUB INVESTMENTS – TEXAS, INC.**,
A Delaware corporation
Its: Authorized Venturer

By: ______________________
Jerry C. Ayoub, President

**CERTIFIED COPY OF RESOLUTIONS**
**AUTHORIZING CONTRIBUTION OF INTEREST**

The undersigned, constituting the President of In Route Trading Company, Inc., a Nevada corporation (the "***Corporation***"), does hereby certify that the Corporation has adopted the following resolutions to be recorded in the minute books of the Corporation, and are in accord with and pursuant to the Corporation's organizational documents and are now in full force and effect, to wit:

**RESOLVED,** that the Corporation is hereby authorized to contribute the Corporation's entire general partnership interest in Southwest Refrigerated Warehousing Services Joint Venture, a Texas general partnership, to Five Star 6021, LLC, an Arizona limited liability company, as a capital contribution (the "***Contribution***"); and

**FURTHER RESOLVED,** that to the extent of any restrictions in the Corporation's Bylaws, the Corporation and the board of directors of the Corporation consent to the Contribution and waive any transfer restrictions contained in the Corporation's bylaws; and

**FURTHER RESOLVED,** that, Jerry C. Ayoub, as President of the Corporation, is authorized to executed any documents and take any other actions as may be reasonable to effectuate the Contribution.

**IN WITNESS WHEREOF**, I have hereunto subscribed my name as the President of the Corporation effective the 1 day of January, 2022.

**PRESIDENT:**

[signature]
**JERRY C. AYOUB**, President of
In Route Trading Company, Inc.

**LIMITED LIABILITY COMPANY RESOLUTIONS**
**REGARDING ACCEPTANCE OF CAPITAL CONTRIBUTIONS**

The undersigned, constituting the Managing Member (the "***Member***") of Five Star 6021, LLC, an Arizona limited liability company (the "***Company***"), does hereby unanimously adopt the following resolutions to be recorded in the minute books of the Company, and are in accord with and pursuant to the Company's Articles of Organization and Operating Agreement and are now in full force and effect, to wit:

**RESOLVED,** that the Member of the Company hereby authorizes the Company to accept the capital contribution by In Route Trading Company, Inc., a Nevada corporation ("***In Route***") of In Route's one percent (1%) general partnership interest in Southwest Refrigerated Warehousing Services Joint Venture, a Texas general partnership (the "***Contribution***"); and

**FURTHER RESOLVED,** that Jerry C. Ayoub, the managing member of the Company, is authorized to execute all documents and to take any other action as may be reasonable to effectuate the Contribution; and

**FURTHER RESOLVED,** that all actions taken prior to the effective date of these Limited Liability Company Resolutions by the Company and its managing member, Jerry C. Ayoub, on behalf of and as the act and deed of the Company with respect to the acceptance of the Contribution described herein are hereby approved, adopted and ratified in every respect; and

**FURTHER RESOLVED** that these Limited Liability Resolutions may be executed in multiple counterparts, each of which shall be deemed to be an original, and all which, when taken together, shall constitute one and the same document. To facilitate the execution of these Limited Liability Resolutions, facsimile, electronic and e-mail/scanned signatures shall be as binding as originals.

**IN WITNESS WHEREOF**, the undersigned, constituting the managing member of the Company has executed these resolutions effective the 1 day of January, 2022.

**MEMBER**:

[signature]

**JERRY C. AYOUB**, Managing Member
of Five Star 6021, LLC

**LIMITED LIABILITY COMPANY RESOLUTIONS**
**REGARDING MEMBER'S CONTRIBUTION**

The undersigned, constituting the Managing Member (the "***Member***") of Five Star 6021, LLC, an Arizona limited liability company (the "***Company***"), does hereby unanimously adopt the following resolutions to be recorded in the minute books of the Company, and are in accord with and pursuant to the Company's Articles of Organization and Operating Agreement and are now in full force and effect, to wit:

**RESOLVED,** the Member of the Company hereby authorizes the Member's contribution of the Member's one hundred percent (100%) membership interest in the Company to In Route (the "***Contribution***"); and

**FURTHER RESOLVED,** that Jerry C. Ayoub, the managing member of the Company, is authorized to execute all documents and to take any other action as may be reasonable to effectuate the Contribution; and

**FURTHER RESOLVED,** that all actions taken prior to the effective date of these Limited Liability Company Resolutions by the Company and its managing member, Jerry C. Ayoub, on behalf of and as the act and deed of the Company with respect to the acceptance of the Contribution described herein are hereby approved, adopted and ratified in every respect; and

**FURTHER RESOLVED** that these Limited Liability Resolutions may be executed in multiple counterparts, each of which shall be deemed to be an original, and all which, when taken together, shall constitute one and the same document. To facilitate the execution of these Limited Liability Resolutions, facsimile, electronic and e-mail/scanned signatures shall be as binding as originals.

**IN WITNESS WHEREOF**, the undersigned, constituting the managing member of the Company has executed these resolutions effective the 1 day of January, 2022.

**MEMBER**:

[signature]

**JERRY C. AYOUB**, Managing Member
of Five Star 6021, LLC

**CERTIFIED COPY OF RESOLUTIONS**
**AUTHORIZING CONTRIBUTION OF INTEREST**

The undersigned, constituting the President of In Route Trading Company, Inc., a Nevada corporation (the "***Corporation***"), does hereby certify that the Corporation has adopted the following resolutions to be recorded in the minute books of the Corporation, and are in accord with and pursuant to the Corporation's organizational documents and are now in full force and effect, to wit:

**RESOLVED**, that the Corporation is hereby authorized to accept the contribution of Jerry C. Ayoub's one hundred percent (100%) membership interest in Five Star 6021, LLC, an Arizona limited liability company (the "***Contribution***"); and

**FURTHER RESOLVED,** that to the extent of any restrictions in the Corporation's Bylaws, the Corporation and the board of directors of the Corporation consent to the Contribution and waive any restrictions contained in the Corporation's bylaws; and

**FURTHER RESOLVED,** that, Jerry C. Ayoub, as President of the Corporation, is authorized to executed any documents and take any other actions as may be reasonable to effectuate the Contribution.

**IN WITNESS WHEREOF**, I have hereunto subscribed my name as the President of the Corporation effective the 1 day of January, 2022.

**PRESIDENT:**

[signature]

**JERRY C. AYOUB**, President of
In Route Trading Company, Inc.

# EXHIBIT D

# TEXAS SECRETARY of STATE
# JANE NELSON

## BUSINESS ORGANIZATIONS INQUIRY - VIEW ENTITY

| | | | |
|---|---|---|---|
| **Filing Number:** | 801122723 | **Entity Type:** | Foreign For-Profit Corporation |
| **Original Date of Filing:** | May 13, 2009 | **Entity Status:** | In existence |
| **Formation Date:** | N/A | | |
| **Tax ID:** | 32039519643 | **FEIN:** | 742702077 |

| | |
|---|---|
| **Name:** | AYOUB INVESTMENTS-TEXAS, INC. |
| **Address:** | 6720 N. Scottsdale Rd., #130<br>Scottsdale, AZ 85253 USA |
| **Fictitious Name:** | N/A |
| **Jurisdiction:** | DE, USA |
| **Foreign Formation Date:** | December 4, 2000 |

REGISTERED AGENT FILING HISTORY NAMES MANAGEMENT ASSUMED NAMES ASSOCIATED ENTITIES INITIAL ADDRESS

| Last Update | Name | Title | Address |
|---|---|---|---|
| September 19, 2014 | JERRY AYOUB | PRESIDENT | 6720 N. SCOTTSDALE STE. 130<br>SCOTTSDALE, AZ 85253 USA |

Order Return to Search

Instructions:
- To place an order for additional information about a filing press the 'Order' button.

# EXHIBIT E

## ENTITY INFORMATION

### ENTITY INFORMATION

**Entity Name:**

IN ROUTE TRADING COMPANY, INC.

**Entity Number:**

C13602-1992

**Entity Type:**

Domestic Corporation (78)

**Entity Status:**

Active

**Formation Date:**

12/14/1992

**NV Business ID:**

NV19921067061

**Termination Date:**

Perpetual

**Annual Report Due Date:**

12/31/2023

### REGISTERED AGENT INFORMATION

**Name of Individual or Legal Entity:**

AMERICAN CORPORATE ENTERPRISES, INC.

**Status:**

Active

**CRA Agent Entity Type:**

**Registered Agent Type:**

Commercial Registered Agent

**NV Business ID:**

**Office or Position:**

**Jurisdiction:**

CARSON CITY

**Street Address:**

123 WEST NYE LN STE 129, Carson City, NV, 89706, USA

**Mailing Address:**

**Individual with Authority to Act:**

Tracey Padilla Deanna K. Kelly

**Fictitious Website or Domain Name:**

## OFFICER INFORMATION

☐ **VIEW HISTORICAL DATA**

| Title | Name | Address | Last Updated | Status |
|---|---|---|---|---|
| President | JERRY C AYOUB | 123 W NYE LANE STE 129, CARSON CITY, NV, 89706, USA | 12/13/2011 | Active |
| Secretary | JERRY C AYOUB | 123 W NYE LANE STE 129, CARSON CITY, NV, 89706, USA | 12/13/2011 | Active |
| Treasurer | JERRY C AYOUB | 123 W NYE LANE STE 129, CARSON CITY, NV, 89706, USA | 12/13/2011 | Active |
| Director | JERRY C AYOUB | 123 W NYE LANE STE 129, CARSON CITY, NV, 89706, USA | 12/13/2011 | Active |

**Page 1 of 1, records 1 to 4 of 4**

## CURRENT SHARES

| Class/Series | Type | Share Number | Value |
|---|---|---|---|
| No records to view. | | | |

Number of No Par Value Shares:

**100000**

Total Authorized Capital:

**100,000**

Filing History Name History Mergers/Conversions

Return to Search Return to Results

# EXHIBIT F

## ENTITY INFORMATION

**Search Date and Time: 8/18/2023 12:49:33 PM**

**Entity Details**

**Entity Name:**

FIVE STAR 6021, LLC

**Entity ID:**

L15271023

**Entity Type:**

Domestic LLC

**Entity Status:**

**Active**

**Formation Date:**

5/18/2009

**Reason for Status:**

In Good Standing

**Approval Date:**

5/22/2009

**Status Date:**

**Original Incorporation Date:**

5/18/2009

**Life Period:**

Perpetual

**Business Type:**

**Last Annual Report Filed:**

**Domicile State:**

Arizona

**Annual Report Due Date:**

**Years Due:**

**Original Publish Date:**

6/8/2009

Statutory Agent Information

**Name:**

EDNA A LOPEZ

**Appointed Status:**

Active

**Attention:**

**Address:**

6720 N SCOTTSDALE RD #130 , SCOTTSDALE, AZ 85253, USA

**Agent Last Updated:**

8/12/2009

**E-mail:**

**Attention:**

**Mailing Address:**

6720 N SCOTTSDALE RD #130 , SCOTTSDALE, AZ 85253, USA

**County:**

Principal Information

| Title | Name | Attention | Address | Date of Taking Office | Last Updated |
|---|---|---|---|---|---|
| Member | JERRY C AYOUB | | % FIVE STAR DEVELOPMENT 6720 N SCOTTSDALE RD STE #130, SCOTTSDALE, AZ, 85253, USA | 4/27/2012 | 5/1/2012 |

**Page 1 of 1, records 1 to 1 of 1**

Address

**Attention:**

**Address:** 6720 N SCOTTSDALE RD #130, SCOTTSDALE, AZ, 85253, USA

**County:** Maricopa

**Last Updated:**

Entity Principal Office Address

**Attention:**

**Address:**

**County:**

**Last Updated:**

Back Return to Search

Return to Results

Document History Name/Restructuring History

Pending Documents Microfilm History

# EXHIBIT G

## ENTITY INFORMATION

**Search Date and Time: 8/18/2023 12:50:57 PM**

**Entity Details**

**Entity Name:**

FIVE STAR 6305, LLC

**Entity ID:**

L15418449

**Entity Type:**

Domestic LLC

**Entity Status:**

**Active**

**Formation Date:**

7/27/2009

**Reason for Status:**

In Good Standing

**Approval Date:**

7/31/2009

**Status Date:**

**Original Incorporation Date:**

7/27/2009

**Life Period:**

Perpetual

**Business Type:**

**Last Annual Report Filed:**

**Domicile State:**

Arizona

**Annual Report Due Date:**

**Years Due:**

**Original Publish Date:**

8/10/2009

**Statutory Agent Information**

**Name:**

EDNA A LOPEZ

**Appointed Status:**

Active

**Attention:**

**Address:**

6720 N SCOTTSDALE RD #130 , SCOTTSDALE, AZ 85253, USA

**Agent Last Updated:**

9/17/2009

**E-mail:**

**Attention:**

**Mailing Address:**

6720 N SCOTTSDALE RD #130 , SCOTTSDALE, AZ 85253, USA

**County:**

**Principal Information**

| Title | Name | Attention | Address | Date of Taking Office | Last Updated |
|---|---|---|---|---|---|
| Member | JERRY C AYOUB | | 6720 N SCOTTSDALE RD #130, SCOTTSDALE, AZ, 85253, USA | 7/27/2009 | 7/31/2009 |

**Page 1 of 1, records 1 to 1 of 1**

**Address**

**Attention:**

**Address:** 6720 N SCOTTSDALE RD #130, SCOTTSDALE, AZ, 85253, USA

**County:** Maricopa

**Last Updated:**

**Entity Principal Office Address**

**Attention:**

**Address:**

**County:**

**Last Updated:**

Back | Return to Search

Return to Results

Document History | Name/Restructuring History

Pending Documents | Microfilm History